## PARAGON JEWEL COAL CO., INC. *v.* COMMIS-SIONER OF INTERNAL REVENUE.

No. 134. Argued March 8, 1965.—Decided April 28, 1965.*

---

*Together with No. 237, *Commissioner of Internal Revenue* v. *Merritt et al.,* also on certiorari to the same court.

*Frederick Bernays Wiener* argued the cause for petitioner in No. 134. With him on the brief were *LeRoy Katz* and *Carl C. Gillespie.*

*Philip B. Heymann* argued the cause for respondent in No. 134 and petitioner in No. 237. With him on the brief were *Solicitor General Cox, Assistant Attorney General Oberdorfer* and *Melva M. Graney.*

*John Y. Merrell* argued the cause for respondents in No. 237. With him on the brief was *Paul P. Senio.*

*Seymour S. Mintz* and *Robert K. Eifler* filed a brief for Jewell Ridge Coal Corp., as *amicus curiae,* urging reversal in No. 134.

*John Y. Merrell* and *Paul P. Senio* filed a brief for Raymond E. Cooper et al., as *amici curiae,* urging affirmance in No. 237.

MR. JUSTICE CLARK delivered the opinion of the Court.

The issue in these consolidated tax cases is whether the lessee [1] of coal lands is entitled to percentage depletion on all the gross income derived from the sale of the coal

---

[1] Paragon Jewel Coal Co. was actually an assignee or sublessee of the coal lands in this particular case. However, this is a factual matter without significance here, and for purposes of convenience it will be referred to as the lessee throughout the opinion.

mined from its leases, or whether contract miners who do the actual mining acquired a depletable interest within the meaning of §§ 611 and 613 (b)(4) of the Internal Revenue Code of 1954 to the extent they were paid by the lessee for mining and delivering coal to it.

The mining contractors, respondents in No. 237, claimed an allocable portion of the allowance for the years 1954 through 1956, while the lessee, petitioner in No. 134, claimed the right to the entire depletion deduction for 1955 through 1957. In each case the deduction was denied the taxpayer. However, the Commissioner now takes the position that the lessee is entitled to the entire allowance;[2] the Tax Court so held, 39 T. C. 257, but the Court of Appeals agreed with the contractors. 330 F. 2d 161. We granted certiorari in No. 134, 379 U. S. 812, and in No. 237, 379 U. S. 886, and consolidated them for argument. We have concluded that the Tax Court was correct and reverse the judgment of the Court of Appeals.

The parties agree that the principles of our opinion in *Parsons* v. *Smith*, 359 U. S. 215 (1959), are controlling here. There we held that the deduction is allowed in recognition of the fact that mineral deposits are wasting assets and that the deduction is intended as compensation to the owner for the part used in production; that there may be more than one depletable interest in the same coal deposit, but that the right to an allocable portion of the allowance depends on the ownership of an economic interest in the coal in place since the statute makes the deduction available only to the owner of a capital interest in such deposit; and, finally, that the legal form of such capital interest is unimportant so long as it constitutes a right with regard to the coal in place.

[2] The Commissioner took a neutral position in the Tax Court, but contended before the Court of Appeals, as he does here, that the lessee is entitled to the depletion deduction on all the gross income derived from the sale of coal mined from its leases.

The problem arises in applying those principles "according to the peculiar conditions in each case." [3]  The mining contractors contend that they made a capital investment in the coal in place because of the nature and extent of their expenditures in preparation for and in the performance of oral agreements which they claim granted them the right to mine certain designated areas to exhaustion.  They contend that they could only look to the extraction and sale of coal for a return of their investment, and thus that the test of *Parsons* v. *Smith, supra,* is satisfied.

Paragon, on the other hand, says that Congress never intended for contractors mining coal to have a depletable interest as evidenced by statutory enactments adopted subsequent to the tax years involved in *Parsons* v. *Smith, supra;* that in the case of a lease the lessor of coal lands is no longer granted a deduction for depletion but is relegated to capital gains treatment only.[4]  And, finally, that the expenditures made by the contractors were only for equipment which they depreciated and could not constitute an investment in the coal in place as required under *Parsons* v. *Smith, supra.*

The Commissioner of Internal Revenue takes the position that only a taxpayer with a legally enforceable right to share in the value of a mineral deposit has a depletable capital or economic interest in that deposit and the contract miners in this case had no such interest in the unmined coal.

### THE FACTS.

Paragon took an assignment of written leases on the coal in and under certain lands which obligated it to pay annual minimum cash royalties, tonnage royalties, land taxes, and to mine all or 85% of the minable coal in the

---

[3] I. R. C. 1954, § 611, 26 U. S. C. § 611 (1958 ed.).

[4] I. R. C. 1954, § 631 (c), 26 U. S. C. § 631 (c) (1958 ed.).

tracts.   It made substantial investments in preparation for processing and marketing the coal, including construction of a tipple, a power line, a railroad siding with four spurs and the purchase of processing equipment.   It also built a road from the tipple which circled the mountain close to the outcrop line of coal.   This road was used to truck the coal from the contractors' mines to Paragon's tipple.

Paragon made oral agreements with various individuals and firms to mine the coal in allocated areas under its leases.   They were to mine the coal at their own expense and deliver it to Paragon's tipple at a fixed fee per ton for mining, less $2\frac{1}{2}\%$ for rejects.   It was understood that this fee might vary from time to time—and it did so—depending somewhat on the general trend of the market price for the coal over extended periods and to some extent on labor costs.   However, any changes in the fixed fee were always prospective, the contractors being notified several days in advance of any change so that they always knew the amount they would get for the mining of the coal upon delivery.   After delivery to Paragon's tipple the contractor had no further control over the coal, and no responsibility for its sale or in fixing its price.   The fixed fee was earned and payable upon delivery and the contractors did not even know the price at which Paragon sold.

The contractors agreed to buy power at a fixed rate per ton from Paragon's line or put in their own diesel engine generator and compressors.   A certain amount per ton was also paid by the contractors for engineering services inside the mine.   An engineer provided by Paragon was used to map out or show each of the contractors the particular direction his mine was to take, the locations of adjacent mines, etc.   The single engineer was utilized for all of the mines to ensure that they would not run into each other and also so that no minable coal would be

rendered unrecoverable by haphazard mining methods. Periodically, the engineer would extend his projections of the mine in order to keep it within the contractor's original location.

Because of the nature of the coal deposits, it was necessary to use the drift-mining method [5] which requires the opening of two parallel tunnels, one for ventilation and the other for working space and removal of coal. In this type operation the roof is supported by leaving pillars of coal in place and erecting wooden supports about every 18 inches.[6] However, as the miners withdraw from a mine where the coal seam has been exhausted, they take out the wooden supports and also remove the coal pillars, thus recovering the last bit of minable coal. Because of the method used it often takes six to eight weeks to develop a mine to the point where it can be operated profitably.

The nature of the coal deposits here involved was such that the miners often encountered "a sandstone roll" which is an outcrop of rock which "squeezes" out the coal. When one of these situations is encountered the miners must move large amounts of rock to reach the coal seam. During this period, of course, they are receiving no money because they are not delivering merchantable coal to Paragon's tipple.[7] At other times, water might accumulate which would have to be pumped out before work

---

[5] Drift mining is an underground mining operation in which a horizontal coal seam is reached by clearing away a part of the mountainside with a bulldozer. Two openings are made into the coal seam. One is an entry and the other is an air course used to ventilate the mine. Coal is removed as the drift mine is driven into the mountain following the seam of coal.

[6] This shoring up prevents cave-ins and like all safety requirements, both state and federal, was done at the miners' expense.

[7] Paragon on at least one occasion shared in the cost incident to going through a sandstone roll of unusual proportions, but that was apparently not the practice.

could resume. Again, the contract miners received nothing for this clearing operation.

After the coal was removed it was placed in the contractor's bins at the entrance to the mine and was later trucked over a connecting roadway built by the contractor to the adjacent road of Paragon and then taken to the latter's tipple. Paragon took all of the merchantable coal mined. If its facilities were full at the moment the contractor would fill his own bins and then shut down his mine. The record shows no deliveries by the contractors to anyone other than Paragon.

Although there was nothing said at the time of the oral contracts regarding who was to receive the depletion, the Tax Court found that Paragon expected to receive that deduction and had fixed its per-ton fee for mining with this in mind. The contracts were also silent regarding termination and were apparently for an indefinite period. However, numerous contractors quit mining, and some sold their equipment, buildings, tracks, etc., to others. Under the agreements, those ceasing to operate could not remove the buildings, but could remove all other equipment. It was anticipated that the contractors would continue mining in their allocated areas as long as it was profitable and so long as proper mining methods were used and the coal met Paragon's standards. However, the contractors were under no obligation to mine any specific amount of coal and were not specifically given the right to mine any particular area to exhaustion.

The contractors paid nothing for the privilege of mining the coal; they acquired no title to the coal either in place or after it was mined; they paid none of the royalty or land taxes required by Paragon's leases; they claim no sublease, no co-adventure, no partnership. Their sole claim to any interest in the coal in place is based on their investment in equipment, connecting roadways, buildings and the costs of opening the mine, and, in some in-

stances, on their installation of track inside the mine to remove the coal. They admit, however, that all of this was removable, save the buildings and the connecting roadways, neither of which represented any appreciable expenditure. All of their expenditures were deducted either as direct costs, development costs, depreciation of equipment or capital assets.

On the basis of these facts the Tax Court concluded as a matter of law that the contractors did not have a depletable interest under their contracts. The Court of Appeals accepted all of the Tax Court's findings but held that the latter erred in its conclusions. It reversed on the basis that the contractors were "performing Paragon's obligation under its leases and this constituted ample consideration" together with their "continuing right to produce the coal and to be paid therefor at a price which was closely related to the market price" to give them "an economic interest in the mineral [bringing] them within the rationale of Parsons v. Smith . . . ." At 163. We believe that the Court of Appeals was in error in so doing.

STATUTORY PROVISIONS FOR COAL DEPLETION.

This Court has often said that the purpose of the allowance for depletion is to compensate the owner of wasting mineral assets for the part exhausted in production, so that when the minerals are gone, the owner's capital and his capital assets remain unimpaired. *United States* v. *Cannelton Sewer Pipe Co.*, 364 U. S. 76, 81 (1960). Percentage depletion first came into the tax structure in 1926 and has been consistently regarded as a matter of legislative grace.[8] We, therefore, must look to the Code provisions and regulations in effect during the years involved to determine whether these contract coal miners acquired a depletable interest in the coal in place.

---

[8] *Parsons* v. *Smith*, 359 U. S. 215, and cases cited in n. 5, at 219.

Section 611 (a) provides for "a reasonable allowance for depletion . . . according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary . . . ." The pertinent regulation states:

"(1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possess[es] a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. . . ." Treas. Reg. § 1.611–1 (b)(1).

Section 611 (b) establishes an equitable apportionment of such allowance between the lessor and the lessee in the case of a lease. However, § 611 (b) must now be read in light of § 631 (c)[9] which provides that an owner who disposes of coal under any form of contract in which he retains an economic interest shall not receive percentage depletion, but instead must take capital gains treatment for the royalties received under that contract. The result of this in the typical lessor-lessee situation is that the

---

[9] For the text of § 631 (c) see n. 10, *infra*.

lessee is entitled to the entire depletion allowance on the gross income from the property. Respondent contract miners make no contention that they are lessees or the sublessees of Paragon.

However, they claim that they are entitled to a portion of the percentage depletion because they have somehow acquired an economic interest in the coal in place. This test was first enunciated in *Palmer* v. *Bender,* 287 U. S. 551, 557 (1933), and has since become the touchstone of decisions determining the eligibility of a party to share in the depletion allowance. The contract miners contend that their investments of time and money in developing these mines bring them within the meaning of our cases. We believe that *Parsons* v. *Smith, supra,* completely settles this question against them.

In *Parsons,* the Court enumerated seven factors to be considered in determining whether the coal-mining contracts there involved gave the contract miners any capital investment or economic interest in the coal in place. They were:

"(1) that [the contract miners'] investments were in their equipment, all of which was movable—not in the coal in place; (2) that their investments in equipment were recoverable through depreciation— not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to [the contract miners] any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that [the contract miners] could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that [the contract miners] were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for

each ton mined and delivered . . . ; and (7) that [the contract miners], thus, agreed to look only to the landowners for all sums to become due them under their contracts." At 225.

The Tax Court found all of these factors present in this case and ruled therefore that *Parsons* controlled.

The Court of Appeals agreed with the contractors' position and held, contrary to the Tax Court, that the contracts under which they mined the coal were not terminable at the will of Paragon but gave the contractors "a continuing right to produce the coal and to be paid therefor at a price which was closely related to the market price." It based its decision on the fact that the operators made "large expenditures of time and money in preparing their respective sites for mining" and that "[i]t would be inequitable indeed to hold that Paragon might . . . then take the benefit of the operators' efforts at will and without cause." At 163. We regret that we are unable to agree.

In *Parsons* the contract was expressly terminable on short notice; here no specific right to terminate was mentioned in the agreement between the parties. However, as the Court of Appeals noted, "the contracts did not fix upon the operators an *obligation* to mine to exhaustion." In fact, many of them quit at any time they chose. We are unable to say that it is any more inequitable to allow Paragon to terminate the contracts at will than it is to allow the contractors to terminate work and thereby impose upon Paragon the obligation to get other people to work the mine or forfeit its right under the leases.

In any event, the right to mine even to exhaustion, without more, does not constitute an economic interest under *Parsons*, but is "a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the

mineral deposit." *Helvering* v. *Bankline Oil Co.,* 303 U. S. 362, 367 (1938).

The court below also indicated that it disagreed with the conclusion of the Tax Court that Paragon could set the price at any level it chose under the agreements. It stated that the contractors were "to be paid therefor at a price which was closely related to the market price." The conclusion of the Tax Court was that while the fee varied somewhat with labor costs, "there [was] *no evidence* that the amount paid by Paragon was directly related either to the price it was getting for the coal or to the sales price of a particular contractor's coal, and the amount was apparently changeable at the will of Paragon." (Emphasis supplied.) 39 T. C., at 282. After an examination of the entire record, we can only conclude that Paragon at all times retained the right to change its fixed fee at will, and after delivery to the tipple, the contractors could only rely on Paragon's personal covenant to pay the posted price. This is insufficient. As we said in *Palmer* v. *Bender,* 287 U. S. 551, 557 (1933), the deduction is allowed only to one who "has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, *to which he must look for a return of his capital.*" (Emphasis supplied.) Here, Paragon was bound to pay the posted fee regardless of the condition of the market at the time of the particular delivery and thus the contract miners did not look to the sale of the coal for a return of their investment, but looked solely to Paragon to abide by its covenant.

This construction of the Act as to coal depletion is buttressed by the language of the Treasury Regulations which, by example, specifically provide that "an agreement between the owner of an economic interest and another entitling the latter to . . . compensation for ex-

traction . . . does not convey a depletable economic interest." This language was taken almost verbatim from *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362, 367 (1938), and incorporated in the first regulations under the Internal Revenue Code of 1939, and since that time there have been no major changes in the economic-interest-versus- economic-advantage paragraph. Compare Treas. Reg. 103, § 19.23(m)–1; Treas. Reg. 111, § 29.23(m)–1; and Treas. Reg. 118, § 39.23 (m)–1 (a)–(b), with Treas. Reg. § 1.611–1 (b)(1). This Regulation has survived through successive amendments of the Internal Revenue Code and therefore is entitled to great weight.

Further, we believe that additional support is given to our construction by subsequent statutory enactments. As noted above, an owner who by contract disposes of the coal in place while retaining an economic interest is relegated to capital gains treatment of the royalties received. However, exemptive language in § 631 (c)[10]

---

[10] Section 631 (c) for the pertinent period read:

"In the case of the disposal of coal (including lignite), held for more than 6 months before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal, the difference between the amount realized from the disposal of such coal and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal. Such owner shall not be entitled to the allowance for percentage depletion provided in section 613 *with respect to such coal.* This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal, and the word 'owner' means any person who owns an economic interest in coal in place, *including a sublessor.* The date of disposal of such coal shall be deemed to be the date such coal is mined. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. This subsection shall have no application, for purposes of applying subchapter

excludes an owner who is also a co-adventurer, partner or principal in the mining of coal, thus permitting such an owner to secure percentage depletion. "Owner" is defined for purposes of this subsection as "any person who *owns an economic interest in coal in place, including a sublessor.*" (Emphasis supplied.) While Paragon is certainly an owner of an economic interest in the coal, it is also a principal in the mining of coal and thus comes within the exemption and is expressly allowed depletion. The contract miners do not claim, nor will the record support a contention, that they are a "co-adventurer, partner, or principal." In contrast to the language of § 631 (c), it is noted that in treating with timber in § 631 (b) an "owner" is allowed capital gains instead of depletion. In this instance "owner" is defined to be "any person who owns *an interest in such timber,* including a sublessor and *a holder of a contract to cut timber.*" (Emphasis supplied.) This last phrase as to contractors is not included in § 631 (c) thus indicating that as to coal, "owner" does not include contract coal miners. Clearly the Congress knew what language to use when it wished to give a contractor a tax allowance. It gave holders of contracts to cut timber capital gains treatment in § 631 (b) but did not so provide for contract coal miners in § 631 (c).

Nor does the opinion in *Commissioner* v. *Southwest Exploration Co.,* 350 U. S. 308 (1956), undercut our conclusion. There the State of California required that the

G, relating to corporations used to avoid income tax on shareholders (including the determinations of the amount of the deductions under section 535 (b)(6) or section 545 (b)(5))." (Emphasis supplied.) It is interesting to note that when § 631 (c) was amended in 1964 to include domestic iron ore Congress did not change the language of this section to also include those mining such ore or coal under a contract since it had made provision for such contractors in § 631 (b) dealing with timber.

State's offshore oil might be extracted only from wells drilled on filled lands or slant drilled from upland drill sites to the submerged oil deposits. Pursuant to that statute Southwest entered into an agreement with upland owners whereby in the event it was awarded a lease by the State it was given the right to use the surface of the upland as a base for its derrick and drilling operation in reaching the leased oil premises. In consideration of this use Southwest assigned to the upland owners, 24½% of the net profits derived from the oil recovered. This agreement was the *sine qua non* of Southwest's securing a lease to drill the submerged land from the State. We held that Southwest's right to drill being expressly conditioned by law upon the agreements with the upland owners made the latter essential parties to the lease from the State and was a sufficient investment by them in the obtaining of the lease to give them an economic interest in the oil in place, which investment was recoverable solely through the extraction of the oil to which they had to look for the return of their investment. Here we have no such statute; the contractors had no part whatever in the lease but were wholly disassociated from it; no fixed percentage of the net income from Paragon's lease was assigned to the contractors; and the latter did not look to the coal but to Paragon for their payment.[11]

For these reasons the judgment is reversed.

*It is so ordered.*

---

[11] We said in *Commissioner* v. *Southwest Exploration Co.*, *supra*, at 317:

"We decide only that where, in the circumstances of this case, a party essential to the drilling for and extraction of oil has made an indispensable contribution of the use of real property adjacent to the oil deposits in return for a share in the net profits from the production of oil, that party has an economic interest which entitles him to depletion on the income thus received."

MR. JUSTICE GOLDBERG, with whom MR. JUSTICE BLACK joins, dissenting.

I respectfully dissent. I cannot accept the Court's formalistic view of the depletion provisions of the Internal Revenue Code of 1954, §§ 611, 613, and 614, which, as applied to this case, would give the entire depletion allowance to Paragon, the lessee of the coal-bearing land. I cannot agree with the Court's decision that a lessee of mineral lands, whose total investment may consist merely of a promise to pay a small royalty for minerals produced, is entitled to the full allowance for depletion and that no share of this allowance is to be apportioned to a mining company with substantial investment in digging and maintaining a particular coal mine. I believe that the issue in this case is basically a simple one: For purposes of the depletion allowance under the Internal Revenue Code, should the mine operators here be viewed as independent contractors selling their services to Paragon, the lessee, or should they be viewed as entrepreneurs participating in a type of joint venture to which Paragon contributes its lease of the land and certain necessary equipment and for which the mine operators provide the other investment necessary to open and run the mines? A look through the formal legal arrangements to the underlying economic realities makes clear that the position of the miners is far closer to that of the entrepreneur participating in a joint venture than to that of a seller of services. For this reason I would hold that the miners have "an economic interest in the . . . [mineral], in place, which is depleted by production," *Palmer* v. *Bender,* 287 U. S. 551, 557, and they are therefore entitled to a fairly proportioned share of the depletion allowance.

The factual situation presented by this case is far different from that considered by the Court in *Parsons* v.

*Smith,* 359 U. S. 215. *Parsons* held that persons contracting with the owners of coal-bearing land to strip-mine the land were not entitled to an allowance for depletion. *Parsons* involved comparatively little investment in any particular mines. The coal was obtained through a strip-mining process which consists of removing the earth which lies over the coal, and then removing the coal uncovered. The entire investment of petitioners in *Parsons* took the form of equipment, such as mechanical shovels, trucks and bulldozers, which "was movable and usable elsewhere in strip mining and . . . for other purposes." *Parsons* v. *Smith, supra,* at 219. In fact, one of petitioners in *Parsons* was primarily a road-building firm. It insisted upon a contract terminable by either party on 10 days' notice since, " '. . . if an opportunity opened up, [it] wanted to go back to road building,' " *id.,* at 216, for which its shovels and bulldozers were primarily designed. The contracts of both petitioners in *Parsons* were made terminable on very short notice. Thus the strippers in *Parsons* were clearly independent contractors hired to do the stripping, not entrepreneurs with a fixed investment in a particular mine.

On the other hand, the mines here involved were not strip mines but deep underground mines. The mine operators in the instant case had to use a drift, rather than a strip, method of mining. Unlike a strip-mine contractor, who can begin full production immediately upon removal of the overburden with one employee and a mechanical shovel, the drift-mine operators here had to employ a number of miners and spend many months opening the underground mines. The operations of the miners here included cutting shafts, building a railroad spur, opening ventilation tunnels, shoring the roof of the mine, removing rock and unmarketable coal, and developing entries, cross sections, rooms and air courses, etc. Normally six to eight weeks was required before any mar-

ketable coal was reached and several months before the mine reached the production [1] stage. Moreover, even after the production stage was reached, the miners had to face and prepare pillars of coal for support, and frequently they spent many weeks excavating worthless "rolls" of nonmarketable rock or removing excess water from the mines. All this activity required considerable capital investment.

Kyva and Standard, the two partnerships of mine operators involved here, state without challenge that as of the end of 1956, they had invested in machinery, $33,263.81 and $26,901.30, respectively. Their expenses during their first year of operation were, respectively, $76,036.64 and $73,214.02. This expense was primarily capital expense representing investment in the mine, making it ready for exploitation of the coal in place. Unlike *Parsons* where the bulldozers, trucks and shovels were movable and primarily designed for road building and other work, the major part of the mine operators' capital investment here consisted of labor costs and was usable only in this particular underground mine operation. The mine operators could look for a return of their investment only to sales of the coal which they were to mine. Moreover, the Court of Appeals held that Paragon's contracts with the operators were not terminable at will or upon short notice, and that "the operators had a continuing right to produce the coal and to be paid therefor at a price which was closely related to the market price." 330 F. 2d 161, 163. Under these circumstances I believe it undeniable that the operators invested considerable time, labor, and equipment in the coal in place. In order to extract the mineral, they pooled their resources, funds, and energies with Paragon, which supplied its base interest and made other investment necessary

---

[1] For the applicable definition of production stage, see Treas. Reg. § 1.616–2 (b).

for processing and marketing the coal. I would hold, with the Court of Appeals, that the operators as well as Paragon fit within the rule enunciated in *Palmer* v. *Bender, supra,* and followed in other cases,[2] and that they had an economic interest in the mineral in place which entitled them to an allowance for depletion.

The Court tries to assimilate this case to *Parsons* by stating that Paragon could have terminated the interest of the operators in the coal at any time and that the operators had no right to mine their coal veins to exhaustion. The actual facts, however, reveal that Paragon has never taken steps, nor given the slightest intimation that it might take steps, to terminate anyone's contract. As a matter of practical fact the operators could count on mining the coal vein so long as coal remained and selling that coal to Paragon at a rate which varied slightly with the market price of coal. Additionally, the Court of Appeals found that the operators had "a *right* to mine to exhaustion," and a "continuing right to produce the coal and to be paid therefor at a price which was closely related to the market price." 330 F. 2d, at 163. Whether or not the actions of the parties would produce these legal results is, of course, a question of state law. And, it is a clear rule of long standing that this Court, in the absence of exceptional circumstances, accepts the determinations of the Court of Appeals, the members of which are closer to the local scene than we, on questions of local law. *General Box Co.* v. *United States,* 351 U. S. 159, 165; *Allegheny County* v. *Frank Mashuda Co.,* 360 U. S. 185, 191; *Ragan* v. *Merchants Transfer Co.,* 337 U. S. 530, 534. Moreover, in view of the operators' considerable investment in the mines and their substantial reliance on being

---

[2] See, *e. g., Burton-Sutton Oil Co.* v. *Commissioner,* 328 U. S. 25, 32; *Kirby Petroleum Co.* v. *Commissioner,* 326 U. S. 599, 603; *Helvering* v. *O'Donnell,* 303 U. S. 370, 371; *Thomas* v. *Perkins,* 301 U. S. 655, 661.

able to work those mines, I should be most surprised were state courts, contrary to the view of the Court of Appeals, to allow Paragon to terminate the contracts at will or to lower drastically the price it paid for the coal deliberately in order to drive particular operators out of business. Thus this case differs from *Parsons* not only because here the operators had a substantial fixed and unmovable investment in each particular mine, but also because here the operators had a right to mine the coal until it was exhausted in order to attempt to recover their investment and make a profit. In *Parsons,* as I have noted, it was the strip operator itself which insisted upon terminability so that it would be free to move its equipment to more profitable and unrelated opportunities.

The Court, in reaching its result, relies upon Treasury Regulations § 1.611–1 (b)(1) and *Helvering* v. *Bankline Oil Co.,* 303 U. S. 362. With all deference I do not believe that either the regulation or *Bankline Oil* bears significantly upon the issue here presented. The regulation in its entirety makes clear that "[a]n economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place ... and secures, by any form of legal relationship, income derived from the extraction of the mineral . . . . But a person who has no capital investment in the mineral deposit . . . does not possess an economic interest merely because through a contractual relation he possess[es] a mere economic or pecuniary advantage derived from production." [3] The regulation thus indicates that the ques-

---

[3] Treas. Reg. § 1.611–1 (b)(1) reads as follows:

"Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he

tion to be asked is whether the mine operators have a significant investment in the coal in place. I think it clear from the facts I have recited that their investment has given them an economic interest in the coal. *Bankline Oil* held that a processor of natural gas who received the gas at the mouth of the well and " '. . . had no enforceable rights whatsoever under its contracts prior to the time the wet gas was actually placed in its pipe line,' " "had no capital investment in the mineral deposit," for he "had no interest in the gas in place." 303 U. S., at 368. The facts that "the taxpayer's capital investment was in equipment facilitating delivery of the gas produced rather than in equipment for production of gas, . . . that its function was not production of gas but the processing of gas," G. C. M. 22730, 1941–1 Cum. Bull. 214, 220, and that the taxpayer had no enforcible right to receive any gas from the well,[4] all adequately distinguish *Bankline Oil* from the case here before us.

Further, I find this case virtually indistinguishable from *Commissioner* v. *Southwest Exploration Co.,* 350 U. S. 308. In *Southwest Exploration,* owners of uplands next to offshore oil drilling sites allowed drillers to use their land as a base for offshore drilling operations in re-

_____

must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possess[es] a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. Further, depletion deductions with respect to an economic interest of a corporation are allowed to the corporation and not to its shareholders."

[4] The Court of Appeals found that the mine operators here had an enforcible right to mine the coal to exhaustion. See discussion, *supra,* at 642.

turn for 24½% of the net profits derived from the oil recovered. Though no oil lay under the owners' land, under California law offshore oil could be extracted only from filled lands or by slant drilling from upland drill sites. The Court held, because the owners of the upland sites had contributed the use of their land, necessary for the extraction of the oil, in return for a share in the net profits from the production of oil, that they had "an economic interest which entitle[d] . . . [them] to depletion on the income thus received." 350 U. S., at 317. The coal mine operators in this case made as significant an investment in the mine as did the upland owners in *Southwest Exploration*. Their contribution was as necessary for the extraction of the coal as was the land for the extraction of the oil. They were as dependent upon the coal for the recoupment of their investment as were the landowners upon the oil. Though the mine operators had little control over who bought the coal, there is no indication that the landowners had any control over who bought the oil. And the mine operators made a substantial investment in the mine—not an investment in machinery which could be moved from place to place or mine to mine, but a fixed investment of time and labor in opening and developing the mine. The coal mine operators could look only to a sale of the coal for the return of their investment.

The Court also attempts to draw support from §§ 631 (b) and (c) of the Internal Revenue Code of 1954 as showing a congressional intent not to allow mine operators to share in the depletion allowance. These sections, however, have nothing to do with the issue of apportioning the depletion allowance here under consideration. They state only that the holders of certain passive kinds of income interest, such as royalty interests in coal like that of the *lessor* in this case—interests quite unlike those owned either by Paragon or the mine operators here— will *not* receive any allowance for depletion but *instead*

will receive capital gains treatment for their income. See S. Rep. No. 781, 82d Cong., 1st Sess., 43. Section 631 (b), a rather lengthy subsection, provides capital gains treatment for the income of certain passive owners of timber interests and states in part that "[f]or purposes of this subsection, the term 'owner' means any person who owns an interest in such timber, including a sublessor and a holder of a contract to cut timber." This definition, by its very terms, applies only to § 631 (b), a section with no bearing on the question at issue here. Section 631 (c), also a lengthy subsection, provides for capital gains treatment for income arising from coal royalties. To make certain that only passive holders of royalties received capital gains treatment and that holders of working interests did not receive capital gains treatment but instead received a depletion allowance, Congress specifically excluded holders of working interests from the coverage of § 631 (c). Congress stated that certain owners of royalty interests would receive capital gains treatment, but stated that "[t]his subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal, and the word 'owner' means any person who owns an economic interest in coal in place, including a sublessor." This definition is meant to exclude from the coverage of § 631 (c) not only mine operators, but also lessees such as Paragon, whose income does not arise from passive royalties. In my view, this sentence adequately does the job Congress intended for it to do, for the income of both mine operators and lessees falls within the scope of "income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal." See S. Rep. No. 781, *supra*, at 43.[5]

[5] The Court points out that the mine operators do not claim to be a "co-adventurer, partner, or principal" in the mining of the coal. *Ante*, at 637. The mine operators, however, do claim to be engaged in a type of joint venture with Paragon in mining the coal. It is

Even were I to assume that the definitions of "owner" in §§ 631 (b) and (c) have a more direct bearing upon §§ 611, 613, and 614, the sections dealing with the depletion allowance, §§ 631 (b) and (c) would not show that Congress did not intend to grant contract miners for coal any depletion allowance. "[A] holder of a contract to cut timber" may well have been included specifically in § 631 (b)'s definition because Congress wished to make crystal clear that *all* holders of contracts to cut timber were to receive capital gains treatment for their income. See H. R. Rep. No. 1337, 83d Cong., 2d Sess., 59. Congress may not have included a similar provision in § 631 (c) because it did not believe that the *strip* miner, whose function is similar to that of the holder of a contract to cut timber, should be brought within the coverage of § 631 (c); or Congress may have felt that since lessees such as Paragon were not included within the coverage of § 631 (c), holders of contracts to mine coal should similarly not have their income treated as a capital gain; or the issue of according capital gains treatment to the income of contract mine -operators might not have been before the Committee when § 631 was being drafted. If §§ 631 (b) and (c) have any relevance to this case, it must be in the fact that § 631 (c) defines an owner as a person "who owns an *economic* interest in coal in place" (emphasis added), thus indicating a specific congressional intent that formal *legal* ownership of the mineral should not be controlling.

Finally, it is argued that the operators were able to recover their investments through depreciation and to allow them depletion as well would be to permit a double recovery of their costs. This argument overlooks the fact that Paragon too is able to recover every cent of its invest-

understandable that they do not use the exact language of § 631 (c), for that section has no bearing upon the question here at issue: whether they own an economic interest in the coal in place.

ment through depreciation and amortization allowances
in addition to depletion. The only investment made by
Paragon which might be considered different in kind from
that of the mine operators is Paragon's promise to pay a
royalty to its lessors of between 30 and 40 cents per ton
of coal.[6] This royalty was fully deductible from Para-
gon's income. Despite the fact that to allow a lessee to
share in the depletion allowance is to allow a double de-
duction, Congress affirmatively stated its intent to allow
lessees of land to share in this allowance. See Internal
Revenue Code of 1954, § 611 (b) (1). Perhaps allowing
both a depletion allowance and depreciation is inequitable,
but this is a congressional decision which is not for us to
question.

I conclude that the depletion allowance should be prop-
erly apportioned between the lessee and the coal mine
operators. The operators were not employees or inde-
pendent contractors hired to perform services. Unlike a
man hired to mow a lawn, or shovel snow, or strip-mine
coal, they made a substantial investment in opening and
developing each individual mine and could look only to
proceeds of the sale of coal extracted for a return of that
investment. Under these circumstances I believe that
the operators meet the test of *Palmer* v. *Bender, supra,*
which undisputedly applies here, for they have "an eco-
nomic interest in the . . . [coal], in place, which is de-
pleted by production." 287 U. S., at 557. While, clearly,
the "phrase 'economic interest' is not to be taken as em-
bracing a mere economic advantage derived from produc-
tion," *Helvering* v. *Bankline Oil Co.,* 303 U. S. 362, 367,
the operators here, unlike the strip miners in *Parsons,* do
not merely derive an economic advantage through produc-
tion; they also have a substantial capital investment in

[6] Paragon paid the mine operators between $4 and $5 per ton for
the coal.

the mineral in place. To refuse to recognize this merely because the operators do not hold legal title to the coal is, in my view, a blind following of form, which I cannot accept.[7] To hold that the operators here are, in fact, like sellers of services is equally unrealistic. I would accept the sound view of the Court of Appeals—the members of which come from local mining areas—that the operators are substantial investors in the coal, and, in accordance with what I believe to be the intent of Congress, I would require that they be permitted a share of the allowance for depletion.

---

[7] Compare this Court's rejection of the argument that only a legal interest can constitute a "substantial interest" in a corporation in *United States* v. *Boston & M. R. Co.*, 380 U. S. 157.