Earl N. and Eunice B. DOTSON, Ralph and Gracie L. Dotson

v.

The UNITED STATES.
No. 23–62.

United States Court of Claims.
Nov. 12, 1965.

---

---

John Y. Merrell, Washington, D. C., for plaintiff.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer and Acting Asst. Atty. Gen. John B. Jones, Jr., for defendant. C. Moxley Featherston, Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

PER CURIAM:

The principal taxpayers are members of a partnership mining coal in 1957, 1958, and 1959, under agreements with coal companies which leased the coal from the owners. This suit claims refunds of taxes for those years on the ground that the Commissioner of Internal Revenue improperly disallowed percentage depletion on the coal mined by the partnership. The case is wholly governed by Paragon Jewel Coal Co. v. Commissioner of Internal Revenue, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (decided by the Supreme Court on April 28, 1965), which held that in a comparable situation the lessee, not the contract-miners, were entitled to the depletion allowance. The present case does not differ from Paragon in any significant particular. Our taxpayers contend that, unlike the contract-miners in the Supreme Court's cases, they agreed to deliver the coal to the lessee only if the lessee would meet the prevailing price, but the trial commissioner has in effect found otherwise in his finding 14, and after review of the record we have adopted that finding as correct. The taxpayers' supplemental brief, filed after the Paragon decision, acknowledges that, if this court accepts finding 14, there is no valid distinction between Paragon and the instant case.[1] Accordingly, the plaintiffs are not entitled to recover and their petition is dismissed.

FINDINGS OF FACT

The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs of counsel, makes findings of fact as follows:

1. Plaintiffs Earl N. and Eunice B. Dotson are husband and wife, and are citizens of the United States, residing at Hurley, Virginia. They filed joint income tax returns for the calendar years 1957, 1958, and 1959 with the Director of Internal Revenue, Richmond, Virginia, and paid the tax shown thereon to be owing in the respective amounts of $3,448.58, $2,297.64, and $3,877.

2. Plaintiffs Ralph and Gracie L. Dotson are husband and wife, and are citizens of the United States, residing at Hurley, Virginia. They filed joint income tax returns for the calendar years 1957, 1958, and 1959 with the Director of Internal Revenue, Richmond, Virginia, and paid the tax shown thereon to be owing in the respective amounts of $1,959.88, $1,078.24, and $2,408.79.

3. During the years 1957, 1958, and 1959, plaintiffs Earl N. Dotson and Ralph Dotson were general partners in the R & E Coal Company (hereinafter referred to as "the partnership"), a Virginia partnership. Each owned a 50 percent interest, was entitled to one-half of the profits, and was obligated to bear one-half of the losses of the partnership.

4. During the years 1957, 1958, and 1959, the partnership mined coal under agreements with Lester Coal Corporation (hereinafter referred to as "Lester"), Kelsa Coal Corporation (hereinafter referred to as "Kelsa"), and Elk Creek Coal Corporation (hereinafter re-

---

1. After Paragon, the parties indicated that they did not desire oral argument.

ferred to as "Elk Creek"). Its gross income from their operations during such years was in the following respective amounts:

| | |
|---|---|
| 1957 ........... | $108,595.89 |
| 1958 ........... | 154,856.56 |
| 1959 ........... | 177,326.66 |

5. In 1957 and 1958, the partnership claimed percentage depletion on all income received in those years, thus reducing the distributive share of partnership income reported by the plaintiffs on their respective Federal income tax returns for such years. Upon examination, the Commissioner of Internal Revenue disallowed the depletion allowance claimed by the partnership, thereby increasing the distributive income to the respective partners. The partnership did not claim percentage depletion in 1959.

6. In 1958, the partnership purchased two new Buick automobiles and, using the straight line method of depreciation, claimed as a business deduction full depreciation on both automobiles for that year. The Commissioner of Internal Revenue disallowed one-half of the depreciation claimed on the two automobiles, thereby increasing the distributive income to the respective partners.

7. On December 28, 1959, plaintiffs Earl N. and Eunice B. Dotson paid deficiencies in income tax for the years 1957 and 1958 in the respective amounts of $1,764.37 and $2,491.49.

8. On December 23, 1959, plaintiffs Ralph and Gracie L. Dotson paid deficiencies in income tax for the years 1957 and 1958 in the respective amounts of $1,490.19 and $2,062.32.

9. On November 9, 1955, W. Mack Lester and Russell Lester, partners trading as Lester Coal Company, leased 10 tracts, containing about 800 acres of coal-bearing land, situated in Buchanan County, Virginia, from The National Shawmut Bank of Boston. The stated purpose of the lease was to allow the lessees to mine and to remove the minable and merchantable coal in, on, and under the leased property. The Lesters also leased additional coal-bearing land of about 4,700 acres. Only the 800 acres leased from The National Shawmut Bank of Boston are directly involved in this suit, since it is from this land, under arrangements to be described later, that the plaintiffs extracted coal. In 1956 and 1958, respectively, the Lesters formed two corporations, Kelsa Coal Corporation and Lester Coal Corporation. Kelsa Coal Corporation (hereinafter referred to as "Kelsa") had its plant at Kelsa, Virginia. Lester Coal Corporation (hereinafter referred to as "Lester") had its plant at Hurley, Virginia. All capital stock in both corporations was owned by W. Mack Lester and Russell Lester. By virtue of terms contained in the lease with The National Shawmut Bank of Boston, all rights and interests thereunder were transferred to the two corporations upon their respective formation.

10. Under the terms of the lease, which was for 5 years and which was automatically renewable, the lessee was obligated, beginning in March 1956, to pay the lessor a royalty of 25 cents per ton for each ton of coal mined from the property. A minimum or certain royalty of $250 per month ($300 beginning in January 1957) was also established although the lessee was allowed to credit amounts in excess of monthly minimum royalties to past months in which the lessee failed to mine a sufficient amount of coal to produce the minimum royalty. The lease strictly prohibited the lessee from subleasing the property without the permission of the lessor but expressly allowed the lessee to contract with third parties for the removal of coal. The lease provided that all taxes which might be levied on the coal in place were to be paid by the lessee. The lease bound the lessee to conduct mining operations in a skillful and workmanlike manner, and to secure an optimum yield of coal from the property until the lessee had extracted all coal which could be economically and safely mined. The lease was recorded in the Clerk's office of Buchanan County, Virginia, on December 12, 1955.

11. By the spring of 1956, Kelsa had been incorporated and had started to prepare certain portions of the leased land for coal extraction by the drift mining method.[2] One or two mine entrances were "faced up"; i. e., the overburden (dirt and stone) had been removed to expose the coal seam.

12. Shortly thereafter, Kelsa leased a nearby coal cleaning and processing plant commonly known as a "tipple" or "dock" from the Mountain Mission School.

13. In conformity with prevalent custom and practice in drift mining, Kelsa chose to and did employ independent contractors, rather than its own employees, to extract and transport their coal to their tipple for weighing, washing, grading, and sale.

14. The arrangements under which Lester and Kelsa secured the removal, by the plaintiffs, of coal from the land it had under lease were informal and were accomplished apparently with few words being exchanged. In early 1956, Earl Dotson was in a barber shop having a haircut when Mr. Mack Lester talked to him about the extraction of coal from Lester's leased land. Dotson told Lester that he would look over the mine site with his partner, Ralph Dotson.

Within a few days, Earl and Ralph Dotson met with Mack Lester at the mine site and decided that they, operating as a partnership, would undertake to work the mine for the Lesters. The Dotsons agreed to deliver all coal extracted to the Kelsa or Lester dock. Since these dock facilities were then somewhat limited, the question arose as to the delivery of coal which Kelsa or Lester could not accept. It was agreed that whenever Kelsa or Lester could not accept the coal, Mack Lester or Russell Lester would authorize its delivery to another dock. It was agreed that upon delivery of coal to the Kelsa or Lester dock, the partnership would be paid a price per ton which would vary from time to time, according to market demand, but which would be competitive with the price paid by the other docks receiving coal in the area. It was a further part of the arrangement (the word "lease" was never mentioned) that if coal extracted from the Kelsa or Lester mine site was delivered to a dock other than to the Kelsa or Lester dock, 30 cents per ton for each ton so delivered would be payable to Kelsa or Lester. Twenty-five cents of this amount, it was understood, was to cover the royalty which Kelsa and Lester were required to pay their lessor and 5 cents was to cover the amount which Kelsa and Lester had to pay their engineer.

15. It was further understood by the parties to the above-described arrangement that, in extracting coal, the partnership would follow the directions of the engineer of Kelsa or Lester. The engineer is charged with the duty of surveying and laying out the mine operation in order to assure that coal extraction is accomplished by the most feasible method. He visits the mine operation periodically and, also, upon request of the miners, furnishes guidance. He goes into the mine and places "spads" which are overhead sighting aids which must be followed in the extraction of coal in order to assure that mining operations are maintained within lease boundaries, and also to assure that there will be no conflict between other mining operations in the immediate area.

16. In conformity with prevailing custom and practice, the parties mutually understood that the partnership was to provide its own equipment, tools and supplies for the extraction of Kelsa's and Lester's coal and its transportation to the tipple of the latter or their designee. The partnership was to construct and

2. Drift mining, prevalent in the Virginia-West Virginia area, involves the extraction of coal from seams less than 3 feet thick. Such shallow seams are known as "low coal" and are not capable of being mined by automatic or highly mechanized equipment. Mining is conducted by driving a horizontal tunnel into the side of a hill. Drift mining is recognized in the industry as a comparatively difficult and economically marginal operation.

maintain whatever power houses and other structures it deemed useful or necessary to fulfill these duties. The partnership was to hire and pay its own labor and to obtain all necessary insurance and mine permits.

17. The partnership extracted coal from the mine and delivered it in accordance with the arrangements described above during all years in suit.

18. The partnership neither paid for nor agreed to pay for the right to mine coal as such.

19. In order to mine coal for Kelsa and Lester, the partnership constructed a coal chute, supply house, powder house (for the storage of explosives) and purchased a partial interest in a sub-station (power plant). As mining progressed, timbers were purchased by the partnership and placed in the mines for support. A road had been built between the site where the partnership work commenced and Kelsa's dock, and the entrance to the mine had been "faced up" by Kelsa at an expense in excess of $1,000. Since this amount was unusually high, it was agreed that the partnership would contribute $400 of the cost by a series of deductions from the partnership's biweekly wages.

20. During the period in suit, all equipment and tools used by the partnership were readily movable and fully depreciable. All chutes and shacks constructed by the partnership were inexpensive wood structures, none costing more than a few hundred dollars to build. Although somewhat impractical, each structure was capable of being torn down, moved, and reconstructed. Each structure was fully depreciable. All expenditures incurred by the partnership for miscellaneous materials and supplies, timbers, and partnership contributions toward "facing up" work, were taken as current business expenses and deducted from partnership income. All partnership expenditures during the period 1957 through 1959 were either fully depreciated or charged off as business expenditures.

21. There was no discussion between the Lesters and the partnership concerning the termination of arrangements between them.

22. It was mutually understood by the parties that the partnership was not responsible for, nor did it at any time pay, any real property or other taxes on the coal in place. All such taxes were paid by Kelsa and Lester in accordance with the terms of their lease with The National Shawmut Bank of Boston.

23. When the partnership's first mine site proved successful, it undertook, with the express or implied approval of Kelsa and Lester, to work additional sites located on the latter's leased property. In one instance, adverse conditions developed in a coal seam and the partnership, without notice, discontinued its work there.

24. During the period in suit, Kelsa and Lester employed numerous contractors, including the partnership, to extract coal for them on property which they leased. The number of contractors employed at any given time ranged from 1 to 25, the number increasing significantly as Kelsa's and Lester's facilities were enlarged. Efficient and skilled contractors were always in great demand. Both Kelsa and Lester were constantly endeavoring to retain and, if possible, supplement their contractor force. Frequently, loans or advancements would be made by Kelsa and Lester to contractors, including the partnership, to aid and encourage them to begin, continue or expand their work.

25. In several instances, the partnership purchased the equipment and structures of fellow contractors who had decided to terminate their agreements with Kelsa and Lester. For example, in 1957, the partnership purchased the equipment of the R & W Coal Company for $1,200 and began to extract coal in the mine which had previously been worked by R & W. The partnership received not only the consent of Kelsa to this substitution but also received a loan from that firm to facilitate its purchase. In 1961, the partnership sold equipment

located at one of the mines it was working to an individual contractor, Glen Casey. Casey testified that since the equipment would be valueless to him without a place to use it, he initially sought W. Mack Lester's assurance that he would be allowed to continue the work the partnership had begun. Mr. Casey also testified that he purchased only the equipment from the partnership and that no consideration of any type was ever requested by the partnership for the coal in place.

26. When, in 1956, the partnership agreed to begin extracting coal at the first of several sites it would thereafter mine, one or two mine entrances had been "faced up" by Kelsa but no coal extraction had occurred. The partnership fully understood that other contractors would subsequently be employed by Kelsa to extract coal from the same seam it would be working but from different entrances.

27. In July 1958 the partnership entered into an oral arrangement with Elk Creek, another coal operator, which also leased coal-bearing lands in Buchanan County, Virginia.

28. The arrangement made with Elk Creek's officials by the partnership was substantially similar to that obtaining between it and Kelsa and Lester except that, because of the geographic location of the mine entrance, the coal extracted for Elk Creek could only be delivered to its dock and, also, Elk Creek deducted 10 cents per ton as its charge for road maintenance it performed on roads used in the delivery of the coal.

29. In March 1959 the partnership terminated its agreement with Elk Creek, without notice, because "we [meaning the partnership] * * * couldn't make anything, * * *." The partnership removed all of their equipment, tools, supplies, and even the various structures which it had built.

30. The following chart represents the disposition of coal extracted by the partnership under its agreement with Kelsa and Lester:

| Coal delivered to: | 1957 | | 1958 | | 1959 | |
|---|---|---|---|---|---|---|
| | Tons | Percent of total | Tons | Percent of total | Tons | Percent of total |
| Kelsa ................. | 21,932.80 | 74.0 | 27,750.19 | 73.8 | 2,628.45 | 5.0 |
| Lester ................. | ............. | ......... | 2,317.40 | 6.2 | 46,252.65 | 87.6 |
| Subtotals .......... | 21,932.80 | 74.0 | 30,067.59 | 80.0 | 48,881.10 | 92.6 |
| Race Fork Coal Corp .. | 5,873.10 | 19.9 | 2,724.75 | 7.2 | 14.25 | ......... |
| Knox Creek Coal Corp .. | 1,121.15 | 3.8 | 246.55 | 0.7 | 17.65 | ......... |
| Pine Oaks Coal Corp ... | 466.00 | 1.6 | 4,464.30 | 11.8 | 3,912.05 | 7.4 |
| House Coal * .......... | 217.50 | 0.7 | 137.90 | 0.3 | ............. | ......... |
| Totals ............. | 29,610.55 | 100.0 | 37,641.09 | 100.0 | 52,825.05 | 100.0 |

* Minimal amounts of coal extracted by the contractor and retained by him for personal use.

31. On or about February 7, 1961, plaintiffs Earl N. and Eunice B. Dotson filed claims for refund for the years 1957, 1958, and 1959 with the District Director of Internal Revenue, Richmond, Virginia, in the respective amounts of $1,764.37, $2,491.49, and $1,936.23.

32. On or about February 7, 1961, plaintiffs Ralph and Gracie L. Dotson filed claims for refund for the years 1957, 1958, and 1959 with the District Director of Internal Revenue, Richmond, Virginia, in the respective amounts of $1,490.19, $2,062.32, and $1,539.14.

33. The Commissioner of Internal Revenue has not acted on said claims for refund and 6 months have elapsed since the claims were filed.

34. Plaintiffs concede that the Commissioner of Internal Revenue properly disallowed one-half of the depreciation which had been claimed by the partnership on the two Buick automobiles.

## CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiffs are not entitled to recover and the petition is therefore dismissed.