**VERICOALS, INC., Appellant,**

v.

**REVENUE CABINET, Commonwealth of Kentucky, Appellee.**

**No. 92–CA–2972–MR.**

Court of Appeals of Kentucky.

Jan. 28, 1994.

John W. Walters, Jr., Stoll, Keenon & Park, Lexington, for appellant.

Michael J. Denney, Frankfort, for appellee.

Before LESTER, C.J., and HOWERTON and HUDDLESTON, JJ.

*OPINION*

HOWERTON, Judge.

Vericoals, Inc. appeals from an order of the Pike Circuit Court affirming an order of the Board of Tax Appeals (BTA) holding that Vericoals is the taxpayer liable for severance tax on coal. We affirm.

On April 1, 1977, N.B. and Susan Williamson Land Co. (Williamson Land Co.) entered into a coal lease with Nuclear Dynamics in which the latter was to mine and sell coal from a tract of property situated on Brushy Creek in Pike County. Nuclear Dynamics was to pay Williamson Land Co. a tonnage royalty for the coal mined.

On June 1, 1981, Nuclear Dynamics assigned this lease to Vericoals. Vericoals agreed to increase the royalty rate to Williamson Land Co. in consideration for its agreeing to the assignment.

On August 1, 1981, Vericoals executed an extensive mining and sales agreement with Unit Coal, Inc., to mine the Broas seam, which was part of a bigger tract on which Vericoals held other mineral leases. The specifics of this agreement with regard to the respective roles of Vericoals and Unit Coal are what is at issue in this appeal. Unit Coal in turn contracted with Marpak to actually conduct the mining activities. It appears that, up until April 1984, Vericoals paid the severance tax on the gross amounts received by Unit for the sale of the coal. In March 1984, Vericoals was acquired by a new owner, Commercial Coal Company, which refused to pay the severance tax on the gross receipts of coal mined, instead paying severance tax on only the proceeds which Vericoals actually received from Unit. The contract terminated in 1985 when Unit completed its mining of the tract.

The Revenue Cabinet conducted an audit for the period of April 1984 through December 1988, and a deficiency of $14,236.21 was assessed for April through September 1984. Interest and penalties were also levied against Vericoals. Vericoals protested the deficiency assessment, setting forth its position as to why it was not liable for the severance tax. The Revenue Cabinet then issued a final ruling, and Vericoals appealed to the BTA, which upheld the Revenue Cabinet's ruling with the exception of the assessment of penalties. Vericoals appealed to the Pike Circuit Court pursuant to KRS 131.-370(1), while the Revenue Cabinet appealed the denial of the penalty assessment to the Franklin Circuit Court. The two cases were consolidated by order of the Pike Circuit Court, which ultimately issued an order upholding the BTA in all respects. Vericoals now brings this appeal.

In appeals from the BTA, the circuit court sits as a reviewing court, hearing the case on the record and disposing of it in a summary manner. KRS 131.370(4). The Pike Circuit Court determined that there was sufficient competent evidence to support the judgment, citing *Sanders v. Mattick,* Ky., 420 S.W.2d 124 (1967). Another way of stating this is whether the findings of fact are supported by substantial evidence. *Epsilon Trading Co. v. Revenue Cabinet,* Ky.App., 775 S.W.2d 937 (1989). However, where the issue presented on appeal "concerned an interpretation and application of the law, the Board's decision was fully reviewable on appeal to the circuit court and thus, was not subject to the clearly erroneous or substantial evidence rule." *Id.* at 940.

Vericoals now argues that: (1) Unit Coal, not Vericoals, is the taxpayer liable for coal severance taxes as Unit Coal had an economic interest in the coal and severed the coal; (2) the economic substance, and not the form, of the agreement between Vericoals and Unit Coal governs who had an economic interest in the coal; (3) Vericoals received an arm's length royalty and therefore cannot be liable for severance taxes under KRS 143.010(10).

■ As to the argument that Unit Coal is the taxpayer liable for severance tax because Unit Coal had the economic interest in the coal and severed the coal, KRS 143.010(5) defines "taxpayer" as:

> any individual, partnership, joint venture, association, or corporation engaged in severing and/or processing coal in this state. In instances where contracts, either oral or

written, are entered into by which persons, organizations, or businesses are engaged to mine or process the coal but do not obtain title to or do not have an economic interest therein, the party who owns the coal or has an economic interest shall be the taxpayer.

In KRS 143.010(10), "Economic interest" is defined as being

synonymous with the economic interest ownership required by Internal Revenue Code Section 611 in effect on December 31, 1977, entitling the taxpayer to a depletion deduction for income tax purposes with the exception that a party who only receives an arm's length royalty shall not be considered as having an economic interest.

26 U.S.C. § 611 states as follows: "In the case of mines, ... there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case." The Code of Federal Regulations defines "economic interest" at 26 C.F.R. § 1.611–1(b)(1) as follows:

An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place ... and secures, by any form of legal relationship, income derived from the extraction of the mineral ..., to which he must look for a return of his capital.... A person who has no capital investment in the mineral deposit ... does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production.

The August 1, 1981, agreement between Vericoals and Unit Coal provides in pertinent part as follows:

"THIS AGREEMENT made and entered into as of the 1st day of August, 1981, by and between NUKITT COAL COMPANY, a division of Vericoals, Inc., a corporation (hereinafter referred to as "Owner"), and UNIT COAL CORPORATION, a corporation (hereinafter referred to as "Unit")."

. . . .

13. Owner shall pay Kentucky business and occupation tax and severance tax imposed on it on account of the coal produced hereunder and sold by it. Unit shall pay all other taxes which may be imposed on or assessed against its operations hereunder, or the equipment or improvements placed upon the Premises by it.

. . . .

17. The coal produced hereunder shall at all times remain the property of Owner; and Unit has no economic interest therein; and Owner shall have the full right of percentage depletion or other depletion with respect thereto for income tax purposes.

18. Owner shall pay all landowners' royalties which may become due as a result of the coal produced hereunder....

As can be seen from the agreement, Vericoals and Unit Coal contemplated that, as between the two, Vericoals would be the owner, with the economic interest, with the right to take the depletion allowance on the tax returns. According to paragraph 13, Vericoals obligated itself to pay the severance tax and did so until April 1984.

Counsel for Vericoals was candid at oral argument that the sole reason for the change in policy concerning the payment of severance tax was that Vericoals had been acquired by new owners. However, the company was still operating under the same agreement as before. Were the payments of severance tax on the gross receipts of Unit Coal prior to April 1984 merely gratuitous?

A determination of who has the economic interest in the mineral, and thus who shall be the taxpayer pursuant to KRS 143.010(5), turns on the facts of a particular case. *Cf. Ramey v. Comm'r of Internal Revenue,* 398 F.2d 478 (6th Cir.1968). "Important, if not decisive, considerations are the intent of the parties and the making of some capital investment in the minerals by the taxpayer." *Id.* at 479.

Indisputably, the intention of the original parties to the agreement was that Vericoals would have the economic interest and would be liable for the severance tax.

[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not and may not enjoy the benefit of some other route he might have chosen to follow but did not. (Citations omitted.)

*Comm'r v. Nat'l Alfalfa Dehydrating,* 417 U.S. 134, 148–149, 94 S.Ct. 2129, 2136–2137, 40 L.Ed.2d 717 (1974). Unit Coal never had an investment in the minerals themselves. Vericoals succeeded to Nuclear Dynamics' right to mine. Unit may have had an investment in equipment, but this could be accounted for by depreciation. *Cf. Parsons v. Smith,* 359 U.S. 215, 225, 79 S.Ct. 656, 663, 3 L.Ed.2d 747 (1959).

Certainly, according to the language of the agreement, Vericoals had all the indicia of ownership in the coal. It was never argued that anyone but Vericoals drafted the agreement. The intent was clear that Vericoals would have the economic interest. We will not substitute new provisions for what was the "plain import" of the makers of the agreement. *Cf. McMahan v. Hunsinger,* Ky., 375 S.W.2d 820, 822 (1964). The new owners of Vericoals should not now be able to circumvent the provisions of the agreement merely because they are not to their liking.

■ Vericoals also maintains that the substance of the contract between Vericoals and Unit Coal belies the plain language of the contract, and that the operative provisions of the agreement are such that Unit Coal had the economic interest. We believe that substance and form of the agreement are consistent. Vericoals did not relinquish its economic interest in the minerals by its agreement with Unit Coal. Vericoals looked not only to Unit but also to the income derived from the extraction of the coal for the return of its capital in the coal. *See* 26 C.F.R. § 1.611; *Palmer v. Bender,* 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). Thus Vericoals also looked to the sale of the coal for its income and not merely to the other contracting party. *Cf. Paragon Jewel Coal Co. v. Comm'r of Internal Revenue,* 380 U.S. 624,

635, 85 S.Ct. 1207, 1212, 14 L.Ed.2d 116 (1965).

According to the agreement, Unit Coal was to sever and process the coal, set the price and the manner of marketing whether it be in the pit or after processing, stockpile and transport the coal, obtain the required permits, construct and maintain roads across the leased property, maintain drainage and silt ponds, and generally control when and how much to mine. Unit Coal listed its payments to Vericoals as royalties. Unit was also to obtain workers' compensation and liability insurance. Unit had the right and responsibility to construct buildings and any structures necessary or convenient to carry out its mining operations, and to remove these at the termination of the agreement.

Vericoals' rights and responsibilities were that it had the right of entry on the premises to mine coal from other seams and to exercise all rights in, on, and to the premises, contrasted with the lease between Williamson Land Co. and Nuclear Dynamics, Vericoals' predecessor, in which Williamson Land Co. gave the lessee coal company the right of quiet enjoyment, retaining no right to enter on the premises without the permission of the mining company. Vericoals also retained the right to set a minimum price for the coal, and if Unit Coal did not obtain that price, then it could be sold by Vericoals. On its tax return, Vericoals listed the money it received from Unit under gross receipts, rather than under the royalties column. Vericoals was also entitled to take the depletion deduction. Vericoals paid the royalties to the Williamson Land Company.

While Unit Coal had broad rights and responsibilities, it still appears that Vericoals had the economic interest in the coal in place. When the agreement ended, Unit Coal could remove its fixtures, but anything not removed would revert to Vericoals after 30 days. Thus Vericoals remained in control of the premises. We believe the substance of the contract upholds the conclusion that Vericoals had the economic interest in the coal.

■ Finally, the proceeds Vericoals received from Unit Coal were not an arm's length royalty referred to in KRS 143.-010(10). A party receiving only an arm's

length royalty does not have the economic interest. Vericoals reported these proceeds as gross receipts and not as royalties on its corporate income tax return; the line for royalties was left blank. There was testimony that the amounts received were almost twice the amount of an average royalty. A taxpayer must accept the tax consequences when he chooses to organize his affairs in a particular manner. *Cf. Higgins v. Smith,* 308 U.S. 473, 477, 60 S.Ct. 355, 357, 84 L.Ed. 406 (1940).

The bottom line here is that Vericoals changed management, and new management decided that it could make a good argument for getting Vericoals out of paying the severance tax. The new management should not be able to abrogate a long-standing custom concerning the liability of severance tax, one to which Vericoals submitted itself, especially when the only other arguable source for the tax can no longer be held accountable.

The judgment of the Pike Circuit Court is affirmed.

All concur.