**UNITED STATES of America,**
**Appellant,**

v.

**R. A. WADE, Individually et al.,**
**Appellees.**

**No. 23960.**

United States Court of Appeals
Fifth Circuit.

July 12, 1967.

Rehearing Denied Aug. 17, 1967.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Thomas L. Stapleton, Attys., Dept. of Justice, Washington, D. C., Macon L. Weaver, U. S. Atty., and E. Ray Acton, Asst.

U. S. Atty., Birmingham, Ala., Jack D. Warren, Atty., Tax Division, Dept. of Justice, Washington, D. C., for appellant.

Paul O. Woodall, William K. Murray, Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., for appellees.

Before COLEMAN and AINSWORTH, Circuit Judges, and CARSWELL, District Judge.

AINSWORTH, Circuit Judge:

This is a suit for recovery of income taxes paid for the years 1958–1961, inclusive. The question presented is whether taxpayer-appellee, a miner of dolomite under a written contract with a quarry owner, had an economic interest in the dolomite in place which entitled him to a percentage depletion allowance in computing his taxable income derived from the mining operations.

R. A. Wade & Company (Wade) was a partnership composed of husband and wife who filed joint income tax returns for the years involved in which they took a percentage depletion deduction of 15 per cent of the amounts received for producing dolomite for United States Pipe and Foundry Company (U. S. Pipe). The Commissioner determined that the taxpayer had no economic interest in the dolomite in place and disallowed the depletion deduction, whereupon taxpayer paid the tax deficiency and brought this suit.

The case was tried before a jury and the court granted the Government's motion for a directed verdict at the conclusion of taxpayer's case on the authority of Paragon Jewel Coal Company v. Commissioner of Internal Revenue, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965). Taxpayer then filed a motion to set aside the verdict and judgment and for a new trial, which the court granted, stating that it was in error in directing a verdict in favor of the defendant and that it "concludes that issues of fact emerged from the evidence pertaining to the economic interest of the plaintiffs in the dolomite in place during the years 1958 to 1961, both inclusive, which should have been submitted to the jury." The case was again tried before a jury and the Government moved for a directed verdict at the conclusion of the taxpayer's case and at the close of its own case, both motions being denied. A single interrogatory was submitted for the jury's consideration by the court as follows: "Do you find that R. A. Wade & Company had an economic interest in the dolomite in place during the years 1958 to 1961, both inclusive?" The jury answered, "Yes," upon which the court then ordered that the taxpayer have judgment in the sum of $64,320.94. The Government's motion for judgment notwithstanding the verdict was denied.

The Government has appealed, assigning as error the action of the district court in initially overruling its motion for summary judgment; in failing to direct a verdict in its favor; and in denying the motion for judgment notwithstanding the verdict.

The Internal Revenue Code of 1954, Section 611 (26 U.S.C. § 611),[1] provides that in the case of mines there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion in accordance with regulations prescribed. According to Section 613

---

1. 26 U.S.C. § 611 reads in pertinent part as follows:

"SEC. 611.   ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) General Rule.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate.   *   *   *

(b) Special Rules.—

(1) Leases.—In the case of a lease, the deduction under this section shall be equitably apportioned between the lessor and lessee."

(26 U.S.C. § 613),[2] in the case of dolomite, the deduction allowed is 15 per cent of the gross income from mining.

The applicable Treas. Reg. § 1.611–1 (1964) provide as follows:

"(b) Economic interest. (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possess a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest." * * *

The written contract dated February 10, 1953, between Wade and U. S. Pipe (and the several amendments thereto) is plain and unambiguous. It constitutes the entire agreement between the parties. The primary purpose of the contract was to produce furnace fluxing stone (dolomite) for use in U. S. Pipe's blast furnace operation. By its provisions U. S. Pipe granted to Wade "the right to strip, mine, crush, wash, or otherwise prepare dolomite" from its North Birmingham rock quarry, owned by it, and agreed to pay Wade $1.26 per gross ton for dolomite so delivered to it under the agreement. U. S. Pipe agreed to notify Wade from time to time of its needs so that at all times Wade would have reasonable time in which to quarry and prepare the tonnage so needed. U. S. Pipe agreed to furnish Wade all equipment owned by it and situated at the quarry, to furnish sufficient electric power to operate the plant and install a suitable transformer for such purpose and Wade agreed to maintain the electric lines. Wade agreed to take over and operate the quarry, to furnish all equipment and labor necessary for stripping and removal of overburden and to deposit the overburden at such point as U. S. Pipe designated; to drill, shoot and load the dolomite into trucks and haul it to the primary crusher in the bottom of the pit, to hoist it to the top crusher and washer, crush and screen it and load it into railroad cars. Quarrying operations were to be conducted at such location as U. S. Pipe should designate from time to time and in a manner satisfactory to U. S. Pipe. Wade agreed to do all neces-

---

2. 26 U.S.C. § 613 reads in pertinent part as follows:

"SEC. 613. PERCENTAGE DEPLETION.

(a) General Rule.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. * * *

(b) Percentage Depletion Rates.— The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:
* * * * *

(4) 10 percent—asbestos (if paragraph (2) (B) does not apply), brucite, coal, lignite, perlite, sodium chloride, and wollastonite.

* * * * *

(7) 15 percent—all other materials (including * * * dolomite. * * *. * * *)
* * * * *

(c) Definition of gross income from property.—For purposes of this section—

(1) Gross income from the property.— The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining."

sary pumping, to provide necessary watchmen, to furnish a superintendent who would supervise the entire operation, to repair and maintain all equipment including crushers, compressor, hoist, pump, washing and screening at his expense, and to use the equipment in place as long as satisfactory. Wade agreed to replace any worn-out equipment when necessary and upon cancellation or termination of the agreement any equipment owned by Wade would be his property with thirty days to remove same. Any parts replaced on equipment of U. S. Pipe by Wade would become the property of U. S. Pipe.

Wade was to handle the disposition of screenings or fines and where possible to sell them and pay U. S. Pipe a royalty of 15¢ per ton.

Wade agreed to furnish U. S. Pipe such dolomite as U. S. Pipe shall from time to time order from it in sizes ¼ inch to 4 inches. Wade assumed liability for any claims for damages arising from the use of the rights granted and to carry necessary liability and compensation insurance.

The agreement was to continue for a period of three years unless earlier terminated by the agreement of the parties, or in the event of Wade's failure to comply with any conditions in the contract or to perform the services satisfactory to U. S. Pipe, if such failure continued after notification of such breach, U. S. Pipe had the right to terminate the agreement by giving Wade thirty days' written notice. Should U. S. Pipe fail to perform any of the conditions required of it, or if the quantity of dolomite should be exhausted, Wade also had a thirty-day right of cancellation. In the event of the termination of the agreement for any cause, Wade had the right to remove within thirty days all structures, machinery and equipment and other property which it had placed upon such lands.

On July 26, 1955, the parties supplemented the agreement by a letter increasing the contract mining price by 15¢ per gross ton effective August 1, 1955. On February 10, 1956, by written amendment, the agreement was extended for three additional years, on the expiration of which a further amendment was entered into extending the agreement for one year and from year to year thereafter unless terminated in the manner previously provided. At the same time the price to be paid to Wade for delivery of dolomite was increased 15¢ per ton to a total of $1.56 per ton.

When Wade entered into the 1953 contract, he purchased direct from the prior contract miner, Cahaba, 4,171 tons of processed dolomite for the sum of $834.20 and also purchased from Cahaba several pieces of equipment which had been used at the quarry. U. S. Pipe placed Wade in complete charge of the disposition of fine stone to other purchasers. Wade leased from the City of Birmingham certain real estate for a six-year term for the purpose of storing the dolomite as it was produced at the quarry. From time to time thereafter Wade made numerous sales to customers of dolomite which was ¼ inch in size and smaller (i. e., smaller in size than the minimum requirements of U. S. Pipe). All dolomite which was above ¼ inch in size was always accepted by U. S. Pipe, and upon delivery and acceptance by it, Wade had no further control or responsibility for the product nor anything to do with the price at which U. S. Pipe sold the dolomite to others. He was not required by the contract to mine any specific amount of dolomite.

Wade made considerable investment in movable machinery and equipment, the book value at the time of trial being $74,429.58, and though portable much of it is special purpose equipment designed for this quarry alone. He also invested $265,459 in non-movable equipment and related expenditures.[3] A new

---

3. Wade's Ex. 17 reproduced in the appendix to his brief is captioned "List of Expenditures and Investments in Non-Movable

Equipment by Wade." The exhibit itself is headed "R. A. Wade—Cost of Removing Overburden and Maintaining

screen, a sand house and processing plant, an office building and a truck repair shop were constructed by Wade on the property.

Wade was engaged in no other business except the quarrying business. Though his contract did not give him an exclusive right, his operations were the only ones at the quarry and he paid all operating expenses which included employees' salaries, rent on the adjacent land leased for stock piling, social security and payroll taxes, and the cost of labor and equipment used in stripping and removing overburden and drilling, blasting and maintenance.

Wade took the usual depreciation deduction on all of the equipment, machinery and buildings which he used at the quarry, and all items of operating cost or expense were deducted as business expenses.

Large quantities of the total dolomite production were shipped by U. S. Pipe to H. K. Porter, one of its customers, on which it made a net profit of up to $1.24 per ton on these shipments.[4]

U. S. Pipe did not participate in the production of dolomite in any way after making its original agreement with Wade. Though the contract was first for a definite term of years, by subsequent amendment it was made automatically self-renewable one year at a time, and there has never been any discussion or notice about terminating it.

■ The Government contends that Wade was merely a contract miner for U. S. Pipe and had no economic or capital interest in the dolomite in place; that the written contract itself granted no economic interest and no considera-tion—money or property—was ever paid by Wade to U. S. Pipe for the right to operate the quarry; that he was to mine the dolomite and receive the stipulated contract price per ton. It states that the material facts are undisputed and that, taking all inferences from the evidence most favorable to the taxpayer,[5] as a matter of law, Wade is not entitled to the depletion allowance. Reliance is had principally on two cases, Paragon Jewel Coal Company v. Commissioner of Internal Revenue, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965) and Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959), which the Government argues are dispositive of the issue and preclude a finding that Wade had a depletable interest in the mining operation. The Government contends that Wade possessed no more than a right to mine as did the contract miners in *Paragon* and *Parsons* who also were paid a fixed amount per ton; that U. S. Pipe had the right to specify the location and mining of the quarrying and when dolomite was delivered in rail cars to U. S. Pipe, Wade had no further responsibility or control with respect to it nor did he have the right to determine the price at which some of the dolomite was sold by U. S. Pipe to others, there being no relationship between that price and the price Wade was paid for his contract quarry operations. The Government further contends that since the contract was terminable without cause at the end of each year by the giving by either party of notice sixty days before the end of the current year, and for cause on thirty days' notice, this important fact showed clearly that Wade had no economic interest in the dolomite in place, and that none was intended by the parties.[6]

---

and Repairing Non-Movable Machinery and Equipment," totaling $265,354.59. The exhibit contains a column breakdown of items entitled "Stripping Overburden," "Hoist Supplies," "Crusher & Washer, Labor, Supplies," which compose the total referred to.

4. The profit referred to is the result of a computation made in the taxpayer's brief based on evidence that U. S. Pipe sold dolomite to H. K. Porter for $2.50 per *net* ton, on which U. S. Pipe paid Wade $1.56 per *gross* ton to produce.

5. As is required by United States v. Simmons, 5 Cir., 1965, 346 F.2d 213, and Turner v. Atlantic Coast Line Railroad Company, 5 Cir., 1961, 292 F.2d 586.

6. The Government points out in its brief that during each of the years involved in

On the other hand, Wade contends that he invested a considerable sum in movable and non-movable equipment and related expenditures; that the facts clearly implied that the intent of the parties was that he should mine the quarry to exhaustion which would occur sometime in the 1970's. Wade further contends that U. S. Pipe surrendered a capital interest in the mineral in place to him when it granted him the right to mine dolomite from its property.[7] He asserts that his operations meet the requirements of *Parsons* and *Paragon* and he argues that these two cases support his position.[8] He contends that he only claims depletion on $1.56 per ton which he receives under his contract, and if U. S. Pipe sells dolomite for up to $1.24 per ton profit, he should have depletion on $1.56 per ton and U. S. Pipe only on the amount up to $1.24 per ton profit.

■ The percentage depletion deduction is permitted as an act of grace in recognition of the fact that mineral deposits are wasting assets and is intended as compensation to the owner for the part used up in production. *Helvering v. Bankline Oil Co.*, 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897 (1938). Thus the owner of a capital interest in the mineral in place is permitted to make a tax-free recovery of that depleting capital asset. *Parsons v. Smith, supra*, 359 U.S. at 220, 79 S.Ct. 656.

In Parsons v. Smith, supra, coal-stripping contractors having contracts to mine coal contended that by providing their equipment and doing the work necessary to the project they should be regarded as having made a capital investment in and the acquisition of an economic interest in the coal in place which entitled them to the depletion allowance. Under the contracts the coal owners agreed to pay the contractors an agreed sum per ton of coal extracted and delivered to the owners. The contracts were terminable without cause on short notice. The Supreme Court held that their agreements did not show any capital investment in the coal in place or that the landowners actually surrendered any part of their capital interest in the coal in place. Accordingly, the Court held that the coal-stripping contractors had bargained for and obtained an economic advantage from the operations but that advantage or profit did not constitute a depletable interest in the coal in place, and denied them a depletion allowance.

Paragon Jewel Coal Company v. Commissioner of Internal Revenue, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965), reaffirmed the principle that contract miners have no capital interest in the mineral deposit in place if their right to payment for delivering the coal they mine is subject to the owner's power to terminate the contracts at will. The miners were held not entitled to the depletion allowance. In *Paragon*, the contracts were silent regarding termination and were therefore for an indefinite period. The contractors paid nothing for the privilege of mining the coal, and acquired no title to coal either in place or after it was mined. They had no lease, nor were they co-adventurers or partners of the coal company. The Supreme Court held that the right to mine even to exhaustion, without more, does

---

this suit, the contract was subject to termination (i. e., without cause by either party) at the end of that year. The first year in suit is the last year of the last three-year contract.

7. Taxpayer's citation of Adams v. Riddle, 233 Ala. 96, 170 So. 343, 107 A.L.R. 657 (1936), is clearly inapposite. There the written instrument between the parties was a mining lease unmistakably created by the contract. The U. S. Pipe-Wade contract is not a mineral lease, or a grant of minerals, and nothing in its terms so indicates any intention to convey a right or interest to dolomite in place.

8. He contends also that since he was free to sell all the fines (waste product under U. S. Steel's minimum requirements) on such terms as he alone determined (being obligated only to pay 15¢ per ton royalty to U. S. Pipe), he had an economic interest in the mineral in place. Eleven to 16 per cent of taxpayer's total production consisted of fines.

not constitute an economic interest but is a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit. Treasury Regulations, § 1.611–1(b) (1) requiring that the taxpayer have an economic interest in mineral deposits to justify a depletion allowance, were specifically approved by the court. In *Paragon,* the same contention was made as is now made by Wade by evidence showing investments in various items of equipment, connecting roadways, buildings and other costs connected with opening the mine.

█ We hold, under the authority of *Parsons* and *Paragon,* that Wade was merely a contract miner to be paid a fixed amount for quarrying dolomite and delivering it to U. S. Pipe; that his contract was terminable without cause at the end of each year, also on thirty days' notice for cause so that he did not have the right to mine to exhaustion of the quarry. He did not acquire an economic interest in dolomite in place by anything to be found in the contract with U. S. Pipe—for none was conveyed to him—or in any other manner determinable from the record in this case. He held only an economic advantage as a result of the mining contract and the investment by him in various items of equipment and other expenses incurred in the quarry operations are insufficient under the Internal Revenue Code of 1954 and regulations established pursuant thereunder to support his claim for a depletion allowance.

In United States Pipe & Foundry Company v. Patterson, N.D.Ala., 1962, 203 F.Supp. 335, 365, the same district court held that U. S. Pipe was entitled to the entire depletion allowance on dolomite in an income tax matter involving its mining contract with Wade. The court found that Wade did not have an economic interest in the dolomite deposits. However, Wade was not a party to those proceedings, and the evidence produced was not identical. Wade is not bound, therefore, by that decision.

In our view the district court should have granted the motion for a directed verdict or for judgment notwithstanding the verdict since there were no material issues as to substantial facts, which were mostly undisputed, and the Government was entitled as a matter of law to judgment in its favor denying the depletion allowance to the taxpayer.

Reversed and rendered in favor of defendant-appellant.