**BAKERTOWN COAL COMPANY, INC., et al.**

v.

**The UNITED STATES.**

No. 53–69.

United States Court of Claims.

Oct. 17, 1973.

LeRoy Katz, attorney of record, for plaintiffs; Richard L. Hirshberg, Washington, D. C., of counsel.

Charles A. Auslander, Jr., Washington, D. C., with whom was Acting Asst. Atty. Gen. Fred B. Ugast, for defendant; Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

### OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to a recommended decision filed January 13, 1972, by Trial Judge George Willi. The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the decision with certain modifications, it hereby affirms and adopts the same as the basis for its

judgment in this case.* Therefore, it is concluded that plaintiffs are entitled to recover and judgments are entered for them in the amounts and for the periods shown in the Conclusion of Law following the findings of fact.

The opinion of the trial judge, as modified by the court, is as follows:

WILLI, Trial Judge:

The determinative question in this tax refund suit challenging the Revenue Service's denial of claimed deductions for percentage depletion is whether the inclusion of a bilateral provision for termination without cause on 30 days' notice converts a lease agreement for the extraction and removal of coal from one that conveys an economic interest in the coal in place into one that does not.

Plaintiffs are two Virginia corporations; Bakertown Coal Company, Inc. (Bakertown), organized as a taxable corporate entity, and Lester Coal Company (Lester), a Subchapter S corporation appearing here by its individual shareholders.

During the periods in suit, the fiscal years ended July 31, 1964 and July 31, 1965, for Bakertown and calendar 1965 for Lester's shareholders, the two companies were involved in the drift mining[1] of coal in southwestern Virginia under certain Agreements of Lease entered into with a lessor of various coal-bearing properties in the area.

The relevant features of the basically identical instruments can be summarized as follows:

1. In return for a tonnage royalty subject to a qualified monthly minimum, Bakertown and Lester acquired the right to mine unlimited quantities of coal from designated areas.

2. The lessees had unrestricted ownership of all coal mined and were therefore free to sell it to whomever and at whatever price they chose. Parenthetically it is noted that in practice they employed a commission agent to sell the mined coal for their respective accounts. Proceeds realized from such sales represented the sole source of revenue from which Bakertown and Lester could recover the rents and royalties that they paid for the privilege of mining. The amount of rent and royalty fees payable was altogether unaffected by the price realized by the lessees from their sales of coal.

3. Either party was entitled to terminate the agreement without cause upon 30 days' advance written notice to the other. In the event of termination, and provided that it was not then in default, the lessee had 60 days to remove any property and improvements that it had located on the leased premises.

After entering into the agreements described above, Bakertown and Lester provided the necessary coal processing and supporting facilities at the leased premises and engaged independent mining contractors for a fixed-fee-per-ton to perform the mining function and deliver the extracted coal to the tipples that the lessees had erected at the production site.

Depreciation deductions have been claimed and allowed for Federal tax purposes in respect to all of Bakertown's and Lester's expenditures for capital improvements pursuant to the agreements

---

* The dissenting opinion of NICHOLS, Judge, follows the opinion of the trial judge which has been adopted by the court.

[1]. Drift mining is an underground mining operation in which a horizontal coal seam is reached by clearing away a part of the mountainside with a bulldozer. Two openings are made into the coal seam. One is an entry and the other is an air course used to ventilate the mine. Coal is removed as the drift mine is driven into the mountain following the seam of coal. Paragon Jewel Coal Co. v. Commissioner, 380 U.S. 624, 629 n. 5, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965).

in suit. Further, current deductions for all operating expenses, including rents and royalties, incurred under the leases, as well as the selling commission separately incurred, have been similarly claimed and allowed.

As additional deductions on their returns for the periods in suit, plaintiffs claimed an allowance for percentage depletion based on the income that each of them derived from sales of coal mined under the aforementioned agreements. When the Internal Revenue Service later audited the returns in question, it disallowed the depletion deductions and assessed the resulting deficiencies in tax. Following payment of the deficiencies and formal disallowance of seasonably filed refund claims this action was brought.

Section 611(a) of the Internal Revenue Code of 1954, as amended, provides for "a reasonable allowance for depletion * * * according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary * * *."

Insofar as pertinent here, Treasury Regulations on Income Tax (1954 Code), Section 1.611–1(b)(1), provides:

(b) *Economic interest.* (1) *Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits * * *. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place * * * and secures, by any form of legal relationship, income derived from the extraction of the mineral * * * to which he must look for a return of his capital.* But a person who has no capital investment in the mineral deposit * * * does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, *an agreement between the owner of an economic interest and another* entitling the latter to purchase or process the product upon production or *entitling the latter to compensation for extraction * * * does not convey a depletable economic interest. * * ** [Emphasis added.]

The concept and definition of economic interest adopted by the Treasury Regulations as the hallmark of eligibility [2] for depletion originated with the Supreme Court in Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). The taxpayer, a lessee of certain oil and gas properties, had transferred his interest in those properties to two oil companies in return for a cash bonus, a future payment to be made "out of one-half of the first oil produced and saved," and an additional royalty of one-eighth of the oil produced and saved. The Court upheld the taxpayer's right to depletion on all receipts from the oil companies on the stated grounds that a taxpayer is entitled to depletion where he has: (1) "acquired, by investment, any interest in the oil in place," and (2) secured "by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." 287 U.S. at 557, 53 S.Ct. at 226. Further, the Court explained, at 558, 53 S.Ct. 225, that a lease under which the lessee has effective control over the extraction and disposition of underlying mineral constituted the lessee's capital investment by which it acquired the requisite economic interest in the mineral in place. Such a conclusion was essentially preordained by the Court's earlier analysis in Lynch v. Al-

2. The regulation's express declaration that a right to receive compensation for extraction of a mineral does not constitute an economic interest in it was added in 1960 by T.D. 6446, 25 Fed.Reg. (Par. 1) 482; presumably prompted by the 1959 decision in Parsons v. Smith, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747, denying depletion to a contractor whose sole interest in a coal deposit was that of receiving a fixed price per ton for the work of removing it from the ground. In 1965 the Supreme Court declared itself explicitly on this point. Paragon Jewel Coal Co. v. United States, *supra,* 380 U.S. at 634, 85 S. Ct. 1207.

worth-Stephens Co., 267 U.S. 364 45 S.Ct. 274, 69 L.Ed. 660 (1925), of the nature of a mineral lessee's property interest in the contest of entitlement to depletion. There, it was said (at 369, 45 S.Ct. at 275):

> It is, of course, true that the leases here under review did not convey title to the unextracted ore deposits, United States v. Biwabik Mining Co., 247 U.S. 116, 123 [38 S.Ct. 462, 62 L.Ed. 1017]; but it is equally true that such leases, conferring upon the lessee the exclusive possession of the deposits and the valuable right of removing and reducing the ore to ownership, created a very real and substantial interest therein. See Hyatt v. Vincennes Bank, 113 U.S. 408, 416 [5 S.Ct. 573, 28 L.Ed. 1009]; Ewert v. Robinson, 8 Cir., 289 F. 740, 746-750. And there can be no doubt that such an interest is property. Hamilton v. Rathbone, 175 U.S. 414, 421 [20 S.Ct. 155, 44 L.Ed. 219]; Bryant [Bryan] v. Kennett, 113 U.S. 179, 192 [5 S.Ct. 407, 28 L.Ed. 908].

Though predicating its denial of plaintiffs' depletion rights solely on the presence of a short-term terminability provision in the subject mining leases, the Government makes no claim that this feature of the agreements either nullifies them (as, for example, sham) or otherwise operates to impart to their remaining terms a meaning or significance materially differing from that conveyed by a natural reading of the language employed. Thus, defendant does not dispute either that these agreements were bona fide mineral leases [3] or that, while in force, they gave plaintiffs essentially the same autonomous authority over extraction and sale of the underlying mineral as did the leases in *Palmer, supra,* and *Alworth-Stephens, supra,* where such authority was held to constitute an ample basis for a depleta-

ble interest. The property interest represented by that authority is not varied or diminished simply because the authority is subject to the possibility of extinction in the future by a termination of the leases on short notice. The legal effect of a termination on these leases is no less prospective because the advance-notice requirement is only 30 days, than it would be if the specified period were one year. Tiffany, Real Property § 159, 255-56; § 588, 511-16 (3d ed. 1939).

Considering the absence of any defensive suggestion that the depletion rights of a mineral lessee today are in some way less than or different from those confirmed in *Palmer* and *Alworth-Stephens* and subsequent definitive Treasury Regulations, and in view of the Government's total preoccupation with the matter of terminability, we think its position in this case is the product of confusion in the economic interest area of depletion. In our view, the entire defense herein rests on a misapplication of basic principle.

It seems to us that the Government is here attempting to remove transactions from the traditional ambit of economic interest by resort to a principle that it sponsored to liberalize and expand that established concept to encompass transactions not theretofore within it. The erroneous transposition is as between lessees; persons who have acquired the right to remove and retain mineral underlying the leased premises, and mining contractors who, although functionally involved in the production of salable mineral (and therefore financially interested in the life of the deposit as a source of continuing need for their services), have no effective authority over production and acquire no ownership of the extracted mineral.

As this court has observed,[4] aside from Commissioner v. Southwest Explo-

---

3. Because it is coal that is involved in this suit, the general prescription of Code Section 611(b) for an equitable apportionment of the depletion allowance between lessor and lessee is inapplicable. See Code Sec. 631(c).

4. CBN Corporation v. United States, 364 F. 2d 393, 396-397, 176 Ct.Cl. 861, 866-867 (1966).

ration Co., 350 U.S. 308, 317, 76 S.Ct. 395, 100 L.Ed. 347 (1956), where upland property owners were deemed to have an economic interest in offshore oil deposits extracted by slant drilling because the use of their property was physically and legally indispensable to the extractive process, the Supreme Court has never found a taxpayer to have a depletable interest in a mineral deposit in the absence of either a fee or leasehold interest in that deposit. Indeed, research has failed to disclose an instance in which any court, prior to 1950, approved a depletion deduction for a taxpayer without one or the other of those credentials. In that year, however, the Treasury first[5] compromised the requirement of a legal interest in the mineral in place. This action, it will be seen, is the real source of the Government's terminability argument in the present suit.

In promulgating G.C.M. 26290 (1950–1 Cum.Bull. 42), the Treasury confirmed an economic interest in a mining contractor whose sole connection with the subject mineral deposit was performance of the extractive function on a fixed-fee basis. The ruling described the function of such an operator as follows:

> Subsequent to development of the steam shovel and other heavy excavating machinery, it was found that coal which did not lie at too great a depth could be economically mined by removing the overlying earth or strata, usually designated as overburden. The companies which first mined coal by this method operated in those parts of the country, principally the Middle West, in which the surface of the land is comparatively level and the coal lies at a fairly uniform distance beneath the surface. These companies bought their own stripping machinery. In the mountainous coal fields of the East there are few large areas which can be mined by removing the over-

burden, and the owner or lessee of the property does not ordinarily buy the necessary stripping equipment. Accordingly, in the case of small tracts of coal land from which the mineral cannot be economically removed by underground mining, as well as in situations in which a fringe of coal near the surface cannot be satisfactorily extracted by underground methods, the contractor who owns stripping equipment has solved a problem of the industry.

After enumerating the landmark precedents, including Palmer v. Bender, *supra,* and Lynch v. Alworth-Stephens Co., *supra* and reciting the definitive principles of economic interest for which they stand, the ruling proceeds with the following exposition of the basis for its conclusion (at 44–45):

> For the purpose of facilitating consideration of the question here involved, a number of stripping contracts which it is understood are typical of those used in the coal industry have been examined. For convenience, the parties to such contracts will be hereinafter referred to as the coal company and the contractor, respectively. In view of the contents of the contracts examined, it is the opinion of this office that, dependent upon their rights in respect of the properties involved, stripping contractors may be properly regarded as entitled to the deduction for depletion in all respects as in the case of other mineral properties. *The fact that some of the contracts bear aspects of agency or employment, or that ostensibly the contractor may not acquire legal title to the mineral, does not control. (See* Caroline C. Spalding v. Commissioner, *supra;* Caroline C. Spalding v. United States, *supra;* T. W. Lee et al. v. Commissioner, *supra;* North Range Mining Co. v. Commissioner, *supra;*

---

5. In 1956 the Treasury issued Rev.Rul. 56–542, 1956–2 Cum.Bull. 327, extending depletion rights to a mining company's stockholders in respect to mineral deposits owned by the company. *See* National Steel Corp. v. United States, 364 F.2d 375, 176 Ct.Cl. 952 (1966).

and Eastern Coal Corporation v. Yoke, *supra*.) The circumstance that stripping contractors at times engage in road building or other forms of activity also appears to be immaterial.

It is not the view of this office, however, that the deduction for depletion is to be granted in every case. On the contrary, it seems clear that *the allowance is warranted only where, under the agreement between the parties, the stripping contractor obtains a capital interest in the mineral in place* and must look to severance and sale of the mineral for the return of capital consumed in that process. (See G.C.M. 22730, *supra*.) In this respect, *it is noted that in some instances contracts may be canceled by the coal company at will. Under such circumstances, it would appear that the contractor receives no binding right to extract the mineral and thus fails to obtain a capital interest therein.* Lacking such an interest in the mineral, it follows that the contractor cannot properly claim a deduction for depletion.

*In the opinion of this office, a contract which is terminable by the coal company at will, and which thus fails to vest in the contractor the requisite capital interest in the mineral in place, is one in which the coal company has an absolute right to cancel at any time without cause or condition.* For example, some of the contracts examined reserve to the coal company the right "at its discretion," without liability for damage or loss to the contractor, to "terminate entirely" all or any part of the work to be done under the contract. It is also the view of this office that a contract which may be arbitrarily terminated by the coal company upon nominal notice should be regarded as one which may be canceled at will. In determining what is "nominal" notice,

the essential factor to be considered is whether, as a result of the right of the coal company to issue such a notice, the contractor is left without a right to possession and emploitation of the property for a period of time sufficient to permit extraction by him of a substantial portion of the mineral deposit. In this respect, it would ordinarily seem proper to conclude that a contract which cannot be arbitrarily terminated by the coal company within less than 1 year is not subject to cancellation on "nominal" notice. [Emphasis added.]

The significance of the ruling for present purposes is that it denominates a mining contractor's "binding right to extract the mineral," albeit under the direction and control of another and with no claim of ownership of the extracted product, as the constructive equivalent of the fee or leasehold rights of control over extraction and disposition of the underlying mineral historically regarded as the embodiment of the capital investment prerequisite to a depletable interest in the deposit. Clearly the ruling does not purport to imply that conventional leasehold rights will only amount to an economic interest if exercisable for at least a year or for some other minimum period. Indeed, both this ruling and the forerunner [6] that it cites with approval, expressly and unqualifiedly affirm the depletion rights of a mineral lessee as defined in *Alworth-Stephens*.

In sum, it appears that the pertinence of the terminability factor, as advanced by the Treasury, was as a device for enlarging the concept of economic interest in order to afford strip miners, who had no fee or leasehold interest, the benefits of depletion deductions to offset the income that they earned in the form of fees for their extractive services.[7]

6. G.C.M. 22730 (1941–1 Cum.Bull. 214).

7. As previously noted in footnote 2, *supra*, beginning in 1960 the applicable Treasury Regulations expressly deny depletion deduc-

tions in respect to such income. Moreover, in 1970 G.C.M. 26290 was formally rescinded as obsolete. Rev.Rul. 70–277, 1970–1 Cum.Bull. 280–281.

In 1959 the Supreme Court first examined and rejected the depletion claims of mining contractors who contended that: " * * * their contractual right to mine coal from the designated lands and the use of their equipment, organizations and skills in doing so, should be regarded as the making of a capital investment in, and the acquisition of an economic interest in, the coal in place." Parsons v. Smith, 359 U.S. 215, 224, 79 S.Ct. 656, 663, 3 L.Ed.2d 747. The Court enumerated no less than seven factual bars to entitlement, as follows (at 225, 79 S.Ct. at 663):

(1) that petitioners' investments were in their equipment, all of which was moveable—not in the coal in place; (2) that their investments in equipment were recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in *Huss,* agreed to be in "full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work"; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts. The agreement of the landowners to pay a fixed sum per ton for mining and delivering the coal "was a personal convenant and did not purport to grant [petitioners] an interest in the [coal in place]." Helvering v. O'Donnell, 303 U.S. 370, 372 [58 S.Ct. 619, 620, 82 L.Ed. 903]. Sure-

ly these facts show that petitioners did not actually make any capital investment in, or acquire any economic interest in, the coal in place, and that they may not fictionally be regarded as having done so.

Though terminability was one of the seven disqualifying factors mentioned, it cannot be considered either in isolation or in the abstract, as the Government would have it. Rather, it is clear that in the context of the contractor-oriented opinion, coming in the wake of G.C.M. 26290 and the decisions that followed it, the matter of terminability becomes only a colorably relevant factor where the applicant for the allowance lacks the traditional qualifications for depletion, as reflected by the other six conditions referenced by the court.

Following the Supreme Court's decision in *Parsons, supra,* the Fourth Circuit denied depletion to two mining contractors and in doing so specifically alluded to the short-term terminability of their mining agreements. Despite these specific holdings, an examination of the cases will reveal that the contractors were equally deficient under each of the six other criteria set forth by the Supreme Court. United States v. Stallard, 273 F.2d 847 (1959); McCall v. Commissioner, 312 F.2d 699 (1963).

In Paragon Jewel Coal Co. v. Commissioner, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965), the Supreme Court again considered the rights of contract miners to percentage depletion. The issue there was whether the Paragon Jewel Coal Co., which was the lessee of coal lands, was entitled to a percentage depletion allowance on all of the gross income derived from the sale of coal, or whether the contract miners who did the actual mining were entitled to an allocable portion of the allowance. In holding that the lessee was entitled to the depletion deduction on all of the gross income from the coal, the Supreme Court noted that the mining contractors foundered on all of the seven criteria which had been set forth in *Parsons,* with the possible exception of the criterion relating

to terminability. Terminability was considered because the Fourth Circuit [8] had based its decision in favor of the contractors in part upon a determination that they had the right to mine the coal to exhaustion. As to that matter, the Supreme Court declared at 634 of 380 U.S. at 1212 of 85 S.Ct.:

> In any event, the right to mine even to exhaustion, without more, does not constitute an economic interest under *Parsons*, but is "a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit."

The Supreme Court also reiterated the rule earlier laid down in Palmer v. Bender, *supra*, and to a large extent rested its decision on findings that the coal company was bound to pay the contractors the posted fee regardless of the condition of the market at the time of delivery and, thus, that the contractors did not look to the sale of the coal for a return of their investment but looked solely to the coal company.

In the context of economic interest, terminability has been specifically considered by the Supreme Court only in the evaluation of depletion claims by mining contractors. For the reasons which are so clearly stated in *Paragon*, we think that the mining contract cases cited by defendant are clearly distinguishable from the case at bar. However, the defendant points to three Tax Court decisions in which depletion was denied a mineral lessee, as distinguished from a mere contract mining operator, on terminability grounds. One of these decisions was affirmed by the Third Circuit.

In Charles P. Mullins, 48 T.C. 571 (1967), the majority denied the lessee depletion under the so-called Bolling Lease, which was terminable by the lessor upon 60 days' notice to the lessee. The court referred to the Supreme Court's discussion of the economic interests of mining contractors in *Parsons* and *Paragon* and relied strongly on the decisions of the Fourth Circuit which have been previously discussed herein and which involved only mining contractors.

The holding in *Mullins* was adopted without further explanation or analysis in a Tax Court Memorandum Decision in Kenneth Whitmer, 28 T.C.M. 1480 (1969), denying a lessee depletion because of a 30-day terminability provision in the lease. The decision was affirmed in Whitmer v. Commissioner, 443 F.2d 170 (3rd Cir. 1971). In support of its holding, the Third Circuit cited United States v. Stallard, *supra*, and United States v. Wade, 381 F.2d 345 (5th Cir. 1967). The taxpayer claiming the depletion allowance in *Stallard* was a mining contractor who was obligated to mine and deliver the coal to the owner at a fixed price per ton. None of the coal was to be otherwise delivered or sold. *Wade* involved a mining contractor who was paid a fixed amount for quarrying dolomite and delivering it to the quarry owner under a contract which did not indicate an intention to convey a right or interest to the dolomite in place. His contract was terminable without cause at the end of each year or on 30 days' notice for cause.

In Winters Coal Co., 57 T.C. 249 (1971), the Commissioner of Internal Revenue urged the court to deny a "lessee" depletion on the grounds that the indenture involved was terminable without cause on 60 days' notice. While the court acknowledged its prior holding in *Mullins*, it chose not to rest its decision solely on the terminability principle for which that case stands. Significantly, it went on to find that though nominally a lessee, the petitioner was in reality the captive operator of the lessor; was economically dominated by it in practice, and consequently had no effective control over the disposition of the extracted mineral.

With deference, we decline to follow these cases in deciding the issue before

---

8. Merritt v. Comm'r and Comm'r v. Paragon Jewel Coal Co., 330 F.2d 161 (1964).

us. At the end of the taxable years in suit, the lease held by the Bakertown Coal Company had been in force for more than 2 years, and the lease of the Lester Coal Company had been in effect for more than 4 years. For application to the facts in this case, we think the following passage from the dissenting opinion of Chief Judge Drennen in Charles P. Mullins v. Commissioner, *supra,* is a more accurate statement of the purpose for which Congress provided the depletion allowance and of the manner in which Congress intended that it be applied:

The percentage depletion deduction is geared primarily to production; it is allowable as a percentage of the gross income from the property, sec. 613(a), I.R.C.1954, which is defined in section 613(c) (except in the case of oil and gas) as "the gross income from mining." Under the Bolling lease, as under the other two leases, petitioners were the only persons who could have any "gross income from mining" the coal that they mined under the lease, except possibly for the royalty paid to the lessor (against which the depletion deduction is not allowed under section 631(c)—see Paragon Jewel Coal Co. v. Commissioner, 380 U.S. [624], 633 [85 S.Ct. 1207, 14 L.Ed.2d 116]). Petitioners were not mining the coal *for* the lessor, as was the situation in the *Paragon* case and many of the contract miner cases which have given rise to so much litigation in this area of tax law in recent years. Under the Bolling lease petitioners were entitled to mine all the merchantable and minable coal under the leased area (unless and until the lease is terminated by the lessor), they were obligated to pay all the costs of mining plus a tonnage royalty on the coal mined, they had complete title to the coal once it was removed, and they were entitled to sell it to whomever they wanted at whatever price they could sell it for. In other words they were required to look to the extraction of the coal and

the sale thereof for a return of their investment and their profit; they were not required to deliver all the coal mined to the lessor for a fixed price or fee per ton.

If the only question here was whether the lessor or the lessees were entitled to the depletion deduction, I would have no hesitancy in saying that the lessees were entitled to it. This is because I think the lessor surrendered all or a part of his economic interest in the coal under the Bolling tract to the lessee while the lease was in effect; and we are concerned with depletion on coal that was mined while the lease was effective.

But there is no question that the case law and the Commissioner's regulations have engrafted on the requirements of the law that to be entitled to a deduction for depletion the taxpayer must have an economic interest in the mineral deposits. I agree with the majority that the petitioners had an economic interest in the coal underlying the Blair and Clintwood leases, for the reasons stated in the opinion. I cannot agree that they had any less economic interest in the coal underlying the Bolling lease; the only difference was that their interest under the Bolling lease was subject to divestment if the lessor exercised his right to terminate. Until such time as the lessor exercised that right, in my opinion petitioners had such an economic interest in the coal deposit that would support the depletion deduction. If the lessor exercised his right to terminate, the entire economic interest would then revert to the lessor. But we are not here concerned with coal mined after that time.

Moreover, we think the views expressed by Chief Judge Drennen in that case are supported by the following statement of the Supreme Court in Lynch v. Alworth-Stephen Co., *supra*:

The general provision in § 12(a), Second, is that the deduction from gross income shall include a reasonable allowance for the "exhaustion

\* \* \* of property." There is nothing to suggest that the word "property" is used in any restricted sense. In the case of mines, a specific kind of property, the exhaustion is described as depletion, and is limited to an amount not exceeding the market value in the mine of *the product mined and sold during the year*. The interest of respondent under its leases in the mines being property, its right to deduct *a reasonable allowance for exhaustion of such property, if there be any, during the taxable year* results from the plain terms of the statute, such deduction, since the property is an interest in mines, to be limited to the amount of the exhaustion of respondent's interest caused by *the depletion of the mines during the taxable year*. We agree with the circuit court of appeals, [8 Cir.] 294 F. [190] 194, that, "The plain, clear and reasonable meaning of the statute seems to be that the reasonable allowance for depletion in case of a mine is to be made to every one whose property right and interest therein has been depleted by the extraction and disposition 'of the product thereof *which has been mined and sold during the year for which the return and computation are made.*' And the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." [267 U.S. 364, 369–370, 45 S.Ct. 274, 275–276] [Emphasis added.]

There is another factor which militates in favor of the plaintiffs. Unless plaintiffs prevail, no one will be entitled to or will receive any percentage depletion allowance on the coal removed from the land during the years at issue. Under the express terms of Section 631(c) of the 1954 Code, the lessors are "relegated to capital gains treatment of the royalties received." Paragon Jewel Coal Co. v. Commissioner, *supra*, 380 U.S. at 636, 85 S.Ct. at 1213. None of the independent contractors has made a claim for a percentage depletion allowance and, if they made such claims, the terms of their contracts with plaintiffs would preclude them from entitlement to such allowances.

This is not a case in which we are called upon to decide whether plaintiffs would be entitled to recover if the duration of their leases was for only one day, or if their leases were terminable at the will of the lessor without advance written notice and without cause. Through the leases which they held, plaintiffs acquired an interest in the coal in place. The leases authorized them to extract and dispose of the coal underlying the leased premises to whomever and at whatever prices they chose. The income which they received was solely derived from and tied to the extraction and sale of the coal during the taxable years involved. The existence of these factors is sufficient to constitute a depletable interest under the rules that have been laid down by the Supreme Court from Lynch v. Alworth-Stephens and Palmer v. Bender to the present time.

Accordingly, the plaintiffs are entitled to recover the deficiencies in suit.

NICHOLS, Judge (dissenting):

I dissent because I do not think the authorities cited support the proposition that a lessee of coal lands has an economic interest in the coal in place if the lease is terminable upon 30 days notice, without cause.

In Parsons v. Smith, 359 U.S. 215, 224, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959) the Supreme Court stated that terminability upon short notice was one of seven factors which required it to conclude that the taxpayer contractor did not have an economic interest in the coal entitling them to deductions for depletion. The majority has interpreted this opinion to mean that terminability is only one of seven factors that must be balanced in determining whether a taxpayer has an economic interest. This inter-

pretation defeats the purpose behind the "economic interest doctrine".

"Economic interest" is a judicial concept designed to give effect to the substance as opposed to the form of a transaction. Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). It requires that a taxpayer have an economic rather than a legal interest in the natural resource in place. Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956). The Tax Court and Fourth Circuit were clearly correct in concluding that there is no such "economic interest" where the rights of the taxpayer in the mineral in place are terminable at the whim of the landowner upon minimal notice. Charles P. Mullins, 48 T.C. 571 (1967); McCall v. Commissioner, 312 F.2d 699 (4th Cir. 1963). I do not think the difference between 30 days notice and one days notice is so great as to warrant a difference in tax treatment as the court intimates. There is nothing in the findings to show that the right to remove coal for 30 days only is of substantial value.

The royalties did not vary according to the market value of coal. It would appear, if that value appreciated, the lessors could terminate in order to preserve to themselves the benefit of the appreciation. If it declined, the lessees could terminate so as to avoid bearing the pecuniary consequences of the decline. If the value of the coal in place in the ground rose or fell according to the market price of severed coal, then the consequences, favorable or unfavorable, of market changes, inured to the lessor, not the lessee.

The court seems to assume plaintiffs fail under only one of the seven criteria used in *Parsons*, terminability, criterion 3, but they also fail under criterion 4 (359 U.S. p. 225, 79 S.Ct. p. 663):

> * * * that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place * * *

You do not have a capital interest in what can be snatched away from you without cause.

The expectation that the other party to a contract, profitable to the taxpayer, will not terminate as he has a right to do, has been held to be a capital asset and the loss from cancellation a deductible loss. Parmelee Transp. Co. v. United States, 351 F.2d 619, 173 Ct.Cl. 139 (1965); Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 186 Ct.Cl. 1 (1968). It is my opinion that the expectation of the taxpayers here, that the leases would not be terminated, was an intangible asset of the same kind, and not an economic interest in the coal in place.